PROVIDENCE WATER
SUPPLY BOARD

v.

PUBLIC UTILITIES COMMISSION.

No. 96–600–M.P.

Supreme Court of Rhode Island.

March 11, 1998.

Michael McElroy, Providence, for Plaintiff.

Alan Shoer, Francis X. Flaherty, William Conley, Jr., John Spirito, Jr., William E. Smith, Paul J. Roberti, Elizabeth A. Kelleher/Peter J. McGinn, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on a petition for certiorari by the Providence Water Supply Board (PWSB or petitioner). The PWSB had sought the approval of the Public Utilities Commission of the State of Rhode Island (PUC) to purchase and install an advanced water-meter-reading system. The PUC issued an order barring the request, reconsidered its action, then reaffirmed its denial. The PWSB then sought certiorari of the PUC's decision. For the following reasons, we grant the petition for certiorari.

### Facts and Procedural History

This case concerns a dispute over the type of water-meter-reading technology to be installed by the PWSB to measure water use by its customers. The PWSB supplies water to approximately 600,000 Rhode Islanders, about half of whom are served through the PWSB's retail system that comprises approximately 68,500 accounts.

Advances in meter-reading technology have made traditional in-building, manual readings unnecessary. Instead, electronic meter interface units (MIUs) installed on the exterior of a customer's building and connected to the inside water-meter by a wire can allow water meters to be read without entering a building. By using an electronic

MIU, also known as an ARB,[1] meter readers can plug a hand-held decoder into the unit mounted on the building's exterior and thereby obtain a meter reading. A more recent technology, called radio-frequency automated meter reading or AMR technology, utilizes a low-power radio transmitter connected to an inside water meter to determine water consumption from outside the premises. The AMR unit transmits to the outside of the building, thereby permitting a meter to be read in one of three ways: (1) by making meter readings from the interior of a van traveling through the customer's neighborhood, (2) by accessing the customer's radio signal from a centrally located stationary receiving unit, or (3) by utilizing a hand-held receiving unit while walking through a customer's neighborhood.

An additional stitch in the tapestry of this case is the Comprehensive Clean Water Infrastructure Act of 1993, G.L.1956 chapter 15.6 of title 46. The act seeks "to protect the purity of present and future drinking water supplies by protecting the infrastructure of potable water, including treatment plants, pipes, valves, pumping stations, storage facilities, interconnections, and water mains." Section 46–15.6–2(3). Under the act, water suppliers such as the PWSB are required to "prepare, maintain, and carry out an infrastructure replacement program." Section 46–15.6–3. The act directs water suppliers to prepare and submit to the State Department of Health a twenty-year "detailed financial forecast of facility replacement improvement requirements," § 46–15.6–4(a)(1), and mandates review of their infrastructure replacement (IFR) components at least once every five years. Section 46–15.6–5(c). The act further requires that after review and approval by the health department, "[e]ach water supplier shall implement the requirements of its infrastructure replacement program and component, including its infrastructure replacement fund." Section 46–15.6–5(d) and (e).

On March 31, 1995, petitioner filed an application with the PUC, seeking a general increase of $11,111,008 in its then-existing rate schedules, which represented an increase of approximately 49.6 percent. As part of the filing, the PWSB sought approximately $4.4 million toward the estimated $13.5 million in projected expenditures for planned infrastructure projects for the 1996 calendar year; $9.1 million in available bond funds was expected to cover the remainder.

At the time of petitioner's application, 26,-765 (approximately 39 percent) of the PWSB's 68,562 retail accounts were serviced by fully operational ARB meters; the remaining 41,797 (approximately 61 percent) lacked such technology and required manual, in-building meter readings. In pertinent part the application proposed the implementation of a comprehensive upgrade of meters using the newer AMR technology. The full estimated cost of the proposed AMR modernization, including associated meter-replacement costs, was listed as a *capital improvement* expenditure on the PWSB's five-year capital plan and was not listed as an IFR component on petitioner's accompanying five-year IFR plan. In addition, however, petitioner's twenty-year IFR plan, also a part of the 1995 submission, projected over $15.5 million in expenditures for "Meters" between fiscal years 2011 and 2015. It was pointed out to the PUC that the five- and the twenty-year IFR plans submitted were only *draft* versions.

The Rhode Island Division of Public Utilities and Carriers (division), which was established pursuant to G.L.1956 § 39–1–3(a) "to serve the commission in bringing to it all relevant evidence, facts, and arguments that will lead the commission in its quasi-judicial capacity to reach a just result," *Providence Gas Co. v. Burke*, 419 A.2d 263, 270 (R.I. 1980), objected to the AMR modernization. The division instead proposed that the PWSB's meter-reading system be repaired and upgraded using the existing ARB technology.

---

1. The acronym ARB refers to a specific outside meter-reading device produced by an Alabama manufacturer. In presenting their respective cases, however, the parties used the term generically to describe an outside reading device that does not employ radio frequency or telephone technologies but rather utilizes a remote receptacle that is read manually by a meter reader using a hand-held reading (decoder) gun. For consistency we adopt the parties' usage.

After several public hearings and open meetings, the PUC issued a report and order on December 26, 1995 (1995 order), which, inter alia, rejected the PWSB's request for a rate increase of $11,111,008 and instead authorized petitioner to file new tariffs designed to recover additional revenues of $8,093,883. The order further authorized the PWSB to collect $4 million "in additional rate year revenues * * * to expense its proposed rate year IFR plan." At the same time, the PUC denied the PWSB's request for the AMR technology.

The PUC observed that estimates for providing ARB technology to the more than 41,500 retail accounts that were without such technology ranged from the division's claim of $3,400,186 to petitioner's estimate of $8,694,349, whereas petitioner's projected expense for implementing the comprehensive AMR system—involving all the PWSB's approximately 68,500 retail accounts—was $18,370,003. Opining that "the costs related to [the AMR system] of consumption recording cannot be taken lightly," the PUC concluded that AMR technology was too expensive. The PUC's 1995 order did authorize the PWSB to collect $400,000 in additional revenues from its ratepayers in order to service the debt incurred by issuing at least $4 million in revenue bonds. The PUC further mandated that petitioner use the $4 million to begin its meter-system upgrade using the ARB technology.

In the wake of the PUC's 1995 order, the final version of petitioner's five-year IFR plan was submitted to the health department for review and approval under a cover letter dated February 29, 1996. The plan listed "[r]eplace[ment of] water meters" as a line item, requesting approximately $4.5 million between fiscal years 1996 and 2000.

On June 17, 1996, the PWSB filed a motion for "Limited Reconsideration Regarding Automated Meter Reading (AMR)" (motion) with the PUC pursuant to Rule 1.28(b) of the PUC's Rules of Practice and Procedure. In the motion, petitioner requested that the

PUC allow the PWSB "to install AMR transmitters instead of outside reading devices (ARBs) on the approximate 41,500 meters which do not have functioning ARBs on them at this time" and asked further that the PUC "allow us to categorize replacement meter costs as an allowable infrastructure replacement (IFR) cost."

Emphasizing that *"[w]e are not requesting any [further] increase in rates,"* the PWSB maintained that it could install AMR transmitters on the more than 41,500 accounts [2] for a revised total cost of $3,863,000. This revised total, the PWSB observed, was well within the $4 million previously approved by the PUC in 1995 for the meter-system upgrade. Referring to its "unfortunate presentation in the original filing," [3] petitioner asserted in its motion that

"because many of the items in the [1995] total AMR implementation cost were already included in our rates, because the actual cost of the AMR transmitter itself has come down by over 30%, and because we are also asking the Commission to allow us to include the replacement of the meters themselves where necessary into the infrastructure replacement (IFR) program, which is where it properly belongs, we have determined that we can install AMRs for an amount equal [to] what this Commission has already authorized for the installation of ARBs on these accounts."

In testimony appended to the motion, PWSB Director of Finance Paul Titzmann (Titzmann) asserted that the PWSB would not need to purchase any more meters for the AMR installation than it would have to purchase for the previously approved ARB upgrade and repair. Moreover, Titzmann emphasized that the cost of replacing the meters was an eligible expenditure in petitioner's IFR program and that, as such, additional funding for the meters was not necessary.

It is undisputed that when the motion was heard before the PUC on September 16,

---

**2.** In its motion for reconsideration, petitioner was not seeking, as it had in 1995, to install the AMR technology on all of its retail accounts.

**3.** The PWSB maintained that its original estimate of costs was erroneous because it was "based on a 'fully loaded cost' accounting approach, rather than a revenues-needed basis."

1996, no evidence was presented to contradict the PWSB's revised estimate of the cost of AMR installation. Significantly, the division, which had opposed petitioner's 1995 request to utilize the AMR technology, endorsed the PWSB's position. In support of its motion, petitioner introduced a Stipulation and Settlement (stipulation) entered into by the PWSB and the division, wherein the division agreed to the implementation of a partial AMR system to be accomplished "without an increase in rates." The stipulation further provided that "[t]he AMR conversion shall be completed within 3 years of the date of the Order of the [PUC] approving this [stipulation], unless the PUC grants an extension of time," and that the PWSB "will file monthly reports with the Division on the status of the AMR program." Moreover, according to the stipulation,

> "[n]o more than the $400,000 in annual expenditure previously allowed in rates for debt service to upgrade the meter reading system * * * may be expended for the AMR materials * * * and AMR program start-up costs (exclusive of any necessary meter changeovers which shall be funded through the IFR program)."

John A. Milano (Milano), the division's interim administrator who had opposed the PWSB's 1995 efforts, testified in support of the stipulation and introduced documentary evidence as well. Among the division's reasons for supporting the AMR conversion, according to Milano, was evidence gleaned from a division data request that revealed that more than 22 percent of the PWSB's existing ARB meters were nonfunctioning.

On November 18, 1996, in a two-to-one decision (1996 order), the PUC denied petitioner's motion, rejected the stipulation, and affirmed its 1995 order. The PUC majority concluded that "an ARB meter reading system remains the more cost effective option" and pointed out that "as we included the costs of new meters in our [December 1995] ARB system upgrade and repair allowance, * * * there is no need to authorize the use of IFR monies for this purpose."

The PWSB petitioned this Court for issuance of a writ of certiorari on November 25, 1996, pursuant to G.L.1956 § 39–5–1. The writ was issued on November 26, 1996, in accordance with § 39–5–2.

### Standard of Review

█ This Court's role in reviewing the PUC's judgments and orders is defined by statute and case law. The Legislature has provided that this Court "may reverse or affirm the judgments and orders of the commission and may remand a cause to it with such mandates as law or equity shall require," § 39–5–4, instructing that

> "[t]he findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission[,] and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39–5–3.

In addition, it is well settled that this Court reviews judgments and orders of the PUC solely to "determine whether the commission's findings are lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific to enable us to ascertain if the evidence upon which the commission based its findings reasonably supports the result." *Roberts v. New England Telephone and Telegraph Co.*, 487 A.2d 136, 138 (R.I.1985); *see also Newport Electric Corp. v. Town of Portsmouth*, 650 A.2d 489, 491 (R.I.1994).

Despite this Court's "limited power" in reviewing decisions and orders of the PUC, *Newport Electric Corp. v. Public Utilities Commission*, 624 A.2d 1098, 1101 (R.I.1993), we may reverse a decision of the PUC, in accordance with § 39–5–3, if we are satisfied that it acted in an illegal, arbitrary, or unreasonable manner. *Id.*

### Petitioner's Timeliness

The PUC claimed that the instant petition "was filed beyond the time limitations mandated by law and therefore must be denied and dismissed." Observing that petitioner filed its motion for reconsideration with the PUC nearly six months after the PUC's 1995

order and then filed its petition for certiorari within a week after the PUC issued its 1996 order following its reconsideration of the PWSB's proposal, the PUC maintained that petitioner "attempts to improperly merge these two decisions for purposes of curing its earlier failure to file a timely appeal [*sic*], from the Commission's December 26, 1995, final report and order."[4] The PUC further contended that petitioner's June 1996 motion for reconsideration, filed pursuant to Rule 1.28(b) of the PUC's Rules of Practice and Procedure,[5] "neither toll[ed] the time for a proper appeal nor * * * create[d] a *de novo* proceeding from which the PWSB may appeal a six month old Commission decision." In support of its claims challenging the timeliness of the PWSB's petition, the PUC cited § 39–5–1, which provides in pertinent part that "[a]ny person aggrieved by a decision or order of the commission, may, *within seven (7) days from the date of the decision or order*, petition the supreme court for a writ of certiorari to review the legality and reasonableness of the decision or order." (Emphasis added.)

We have held that "a failure to petition for a writ of certiorari within seven days of the date of the order, as required by § 39–5–1 renders the findings of the commission nonreviewable. * * * The period for filing a statutory petition for certiorari under § 39–5–1 cannot be extended." *United States v. Public Utilities Commission*, 635 A.2d 1135,

1138 (R.I.1993) (citing *Interstate Navigation Co. v. Burke*, 465 A.2d 750, 755 (R.I.1983)); *see also Providence Gas Co. v. Burman*, 119 R.I. 78, 83–84, 376 A.2d 687, 691 (1977). Moreover, although this Court "has exclusive jurisdiction to issue a common-law writ of certiorari on occasions in which available remedies are inadequate to safeguard a litigant from substantial harm or injustice," *United States v. Public Utilities Commission*, 635 A.2d at 1138 (quoting *Ratcliffe v. Coastal Resources Management Council*, 584 A.2d 1107, 1110 (R.I.1991)), we have observed that "[t]he request for a common-law writ will be considered only in the most extraordinary circumstances because the seven-day filing period provides an adequate remedy at law for parties aggrieved by a commission decision." 635 A.2d at 1139.

On the facts of this case, we are not persuaded by the PUC's timeliness argument and hold that the PWSB's petition was not time barred by § 39–5–1. The unique interplay of two factors informs our conclusion. First, § 39–5–1 expressly allows for Supreme Court review of *any* PUC decision or order, and such review is not limited to those decisions or orders that may be construed as "final" at a given point in time. *Interstate Navigation Co.*, 465 A.2d at 755 ("[t]he Legislature * * * intended that *all* decisions and orders of the commission be appealable to this [C]ourt through petitions for certiorari"

---

4. The PUC's references to the instant action as an "appeal" are technically erroneous. As noted *ante*, G.L.1956 § 39–5–1 provides that decisions and orders of the PUC are reviewed by this Court by means of a petition for certiorari. The PUC's characterization is likely derived from § 39–5–2, which provides in pertinent part that "[u]pon the filing of a proper petition for a writ of certiorari for review in the office of the clerk of the supreme court, the supreme court *shall* cause to be issued a writ of certiorari to the commission." (Emphasis added.) In accordance with this provision a petition for certiorari in respect to a decision or an order of the PUC functions as a de facto appeal.

5. Rule 1.28(b) of the PUC's Rules of Practice and Procedure provides:

"1.28 *RELIEF FROM ORDER*
* * *
(b) *Mistake, Inadvertence, Excusable Neglect, Newly Discovered Evidence, Fraud, Other.*

On motion and upon such terms as are just, the Commission may grant relief for the following reasons:
(1) Mistake, inadvertence, surprise, or excusable neglect;
(2) Newly discovered evidence, which by due diligence could not have been discovered in time to move to reopen the proceedings under Rule 1.26;
(3) Fraud, misrepresentation, or other misconduct of an adverse party;
(4) The order is void;
(5) A prior order on which the order is based has been reversed or otherwise vacated, or it is no longer equitable that the order should have prospective application; or
(6) Any other reason justifying relief from the operation of the order.
During the pendency of an appeal [*sic*], relief may be granted before the appeal is docketed in the Supreme Court and thereafter while the appeal is pending may be granted with leave of the Supreme Court."

(emphasis added)). It necessarily follows that a decision and order rendered pursuant to a utility's Rule 1.28(b) motion is reviewable by this Court.[6] To hold to the contrary would circumvent the clear legislative intent of § 39–5–1.

Concomitantly, we observe that the term "Motion for Reconsideration," as applied to the facts of the instant case, is misleading. The proposal presented to the PUC in conjunction with petitioner's motion was markedly different from the one presented to the PUC in 1995. Most notably, it is undisputed that the 1995 application requested over $18 million to modernize all of petitioner's retail accounts by installing AMR technology, whereas the 1996 submission requested a fraction of that amount for the AMR modernization of only a designated portion of petitioner's retail accounts. To construe these substantively different requests as similar by positing that petitioner's motion was seeking a mere revisitation of the PUC's 1995 order is simply incorrect. In this regard, it is noteworthy that division attorney Paul Roberti, speaking at the September 16, 1996 hearing on petitioner's motion, conveyed the division's perspective as follows: "This may appear to be somewhat of a reversal from the Division's position a year ago. That may be going through your minds; but let me just insure that you understand that *this is not the same proposal that was on the table a year ago.*" (Emphasis added.)

Because § 39–5–1 expressly authorizes this Court to review any decision and order of the PUC and because the second order was issued in respect to a substantively different proposal, we conclude that § 39–5–1 does not bar review of petitioner's claims.

### Petitioner's Management Prerogative

The petitioner contended that the PUC usurped the PWSB's management prerogative when it prohibited the PWSB from installing AMR technology with the funds allocated for meter-reading modernization.

Specifically, petitioner argued that the PUC's 1996 order "illegally usurped [the PWSB's] managerial discretion." Conceding that the PUC possessed the authority to approve or to deny a rate increase to fund meter-reading system modernization, petitioner asserted that once such a rate increase was approved, "[t]he determination of the best and most efficient way to modernize [the PWSB's] meter-reading system [was] a function of management [that] should not be interfered with absent evidence tending to prove that the projected expenditures unreasonably and unjustly affect the ratepayer." We agree.

■ This Court repeatedly has held that the broad regulatory powers of the PUC ordinarily do not include the authority to dictate managerial policy. *See, e.g., Blackstone Valley Electric Co. v. Public Utilities Commission,* 543 A.2d 253, 255 (R.I.1988) ("It is the function of the PUC to regulate a utility in order to determine that its rates are fair and reasonable. It is not the function of the PUC to manage the utility or to exercise the prerogatives of ownership"); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 375, 358 A.2d 1, 13 (1976) ("the commission's refusal to fix a rate of return designed to attract the needed capital investment * * * perhaps * * * constitutes an unwarranted invasion into a field reserved to management"); *United Transit Co. v. Nunes,* 99 R.I. 501, 512–13, 209 A.2d 215, 222 (1965) ("[o]rdinarily, the determination of what shall be expended in the areas [of executive salaries, expense accounts, and legal fees] is a function of management and should not be interfered with absent evidence tending to prove that the projected expenditures unreasonably and unjustly affect the fare-paying public").

■ On the facts before us, we are of the opinion that the selection of meter-reading technology "is an incident of management that as far as appears from the evidence

---

6. As an additional matter, we note that Rule 1.28(c) of the PUC's Rules of Practice and Procedure provides in pertinent part that "[t]his rule does not limit the power of the Commission to entertain an independent action to relieve a party from an order * * *." It appears that petitioner, rather than seek relief from the 1995 order, could have instituted an independent action to bring its proposal before the PUC. The decision and order thereby engendered assuredly would have been reviewable pursuant to § 39–5–1.

would not have an adverse effect on any rights of ratepayers to be charged no more than just and reasonable rates." *Narragansett Elec. Co. v. Kennelly,* 88 R.I. 56, 86, 143 A.2d 709, 726 (1958). As such, we conclude that the PUC exceeded its authority by interfering with this management function absent evidence of "an unjust and unreasonable burden on the ratepayers." *Id.*

### Effect on Ratepayers—AMR Cost Implications

Our prior cases have made clear that even when a management function is at issue, the PUC does not exceed its authority by obstructing such a function to ensure that the rate-paying public is not unreasonably or unjustly affected. *See, e.g., New England Telephone and Telegraph Co.,* 116 R.I. at 375, 358 A.2d at 13; *Nunes,* 99 R.I. at 512–13, 209 A.2d at 222. Our review of the record leads us to conclude that the rate-paying public would not be unjustly or unreasonably affected by the AMR implementation proposed by the PWSB and supported by the division.

After weighing all the evidence before it on reconsideration, the PUC made the following factual finding in its 1996 order:

"[I]f we subtract out the labor costs, overhead costs, and equipment costs as recommended by the PWSB in its instant motion, the costs for an ARB installation on a typical * * * residential account [is] $72.05. An AMR installation * * * [is] $150.40. Under this 'materials only' cost comparison, the AMR installation cost will be 109 percent higher than an ARB installation.

It is obvious to this Commission, that no matter how we interpret the cost data, an AMR meter reading system will invariably cost more than an ARB meter reading system."

Bound as we are by the PUC's findings of fact, *Town of New Shoreham v. Burke,* 519 A.2d 1127, 1130 (R.I.1987); § 39–5–3, we conclude that the PUC did not act illegally in implicitly finding that the imposition of the indisputably more expensive technology would unjustly affect the rate-paying public, the ultimate bearers of the cost. We do, however, consider that finding to be unreasonable. Given the uncontradicted evidence of the benefits of AMR technology over ARB technology, a one-time $78 charge per account to install state-of-the-art meter-reading equipment—a "charge" that can be accommodated within the revenue increase approved by the PUC in 1995—arguably would prove to be more cost-effective in the long run. The benefits of AMR technology would include an increase in the PWSB's ability to bill customers on the basis of actual, as opposed to estimated, readings; postimplementation reduction in personnel; increased ability to detect water leaks and meter tampering; and more frequent billings that would engender better cash flow. Moreover, the PUC itself acknowledged the superiority of AMR technology.[7]

Inasmuch as the PUC's sole reason for denying petitioner's motion was the one-time cost differential, we conclude that such a narrow view ultimately would not be in the best interest of any of the customers of the water-distribution system. Our conclusion finds support in the substantial number of community organizations that supported the AMR alternative.[8] In addition, the record

---

7. In its 1995 order the PUC observed that "AMR meter reading technology is better." Likewise in its 1996 order the PUC acknowledged that it "is fully mindful of the attributes and advantages of an AMR meter reading system over an ARB meter reading system."

8. Among the supporters of record of AMR implementation were the Providence Gas Company (citing its own successful conversion to AMR technology and reporting several current and projected benefits, including substantial increases in efficiency and a reduction in customer inquiries and complaints); the Narragansett Bay Commission (citing the benefit of more timely

and accurate meter readings); Johnson & Wales University (same); Silver Lake Community Center (citing increased safety of the elderly); Fox Point Senior Citizens, Inc. (same); Federal Hill House Association (same); Mt. Pleasant/Valley Community Police (citing elimination of people posing as meter readers to gain access to homes); Mount Hope Neighborhood Association (citing increased billing accuracy and cost effectiveness); Joslin Community Development Corporation (citing increased safety, particularly for elderly, single parent, and working-poor households); Hartford Park Corporation (citing decreased tampering with meters and better con-

suggests that, given the documented 22 percent failure rate of the ARB technology, the conversion to AMR technology eventually would have to be undertaken as a cost-saving strategy.

In its 1996 order the PUC majority acknowledged that the 1995 order choosing ARB technology over AMR technology "was grounded on the cost implications of each proposal, and their respective concomitant impact on the aggregate rate increase being faced by ratepayers." The PUC reasoned in its 1995 order that

"because of the rate increases being contemplated herein, we find that this technology is not presently affordable. * * * [T]he enormous infrastructure replacement revenues needed by the PWSB and requested in this rate case preclude us from seriously entertaining the PWSB's contemporaneous request for an AMR meter system. Therefore, we will not authorize any revenues for an AMR meter system at this time."

Although the PUC majority accepted petitioner's contention in support of the motion that the PWSB's original estimate for the installation of AMR technology had been rendered inapplicable both due to errors in its calculation and due to the reduction in price of the AMR MIU, the majority nevertheless reasoned:

"The PWSB would have us believe that the cost of an AMR conversion is no longer more expensive than repairing and upgrading its ARB meter reading system. We have considered the PWSB's so-called 'better data' and find the PWSB's arguments without merit."

The majority then concluded, "As we still believe that the PWSB's ratepayers cannot currently afford the higher cost of an AMR meter reading system, we see no reason to modify our original decision on this issue." But as the record before us amply demonstrated, the PWSB never contended that the implementation of AMR technology would cost the same as or less than the ARB up-

grade. Rather the PWSB's claim—and the heart of the controversy before us—was that the AMR modernization could be accomplished *within the rate increase already approved by the PUC*, that is, at no additional cost to the rate-paying public.

No testimony or evidence during the hearing on petitioner's motion contradicted the PWSB's claim in this regard. To the contrary, the division, the entity created by the Legislature "to implement the policies of the state in regulating public utilities and carriers so as to achieve ultimate policy goals of providing for adequate, efficient, and economical energy, communication, and transportation services and water supplies at just and reasonable rates," *Providence Gas Co. v. Burke*, 419 A.2d 263, 269 (R.I.1980), clearly stipulated that the proposed AMR modernization could and would be implemented without affecting the PUC's approved rate schedule. We consider the division's position in this case to be particularly persuasive. Although it opposed the PWSB's original AMR proposal, the division entered into the stipulation in 1996 having compiled data obtained by interrogatories and independent inquiry, and by research within the national meter-technology industry. We further note the acknowledgment by PUC counsel at oral argument before this Court that instances in which the PUC rejects a proposal that the division has approved are a "rather rare circumstance."

Although we decline to approve petitioner's suggestion that any decision or order of the PUC rendered solely on the basis of a cost comparison is erroneous as a matter of law, it is our conclusion that on the facts of this case the PUC's decision to disallow the AMR technology was unreasonable.

### Use of IFR Funds for Meter Replacements

The petitioner also claimed that the PUC acted illegally and unreasonably when it prohibited petitioner from using IFR funds to purchase and install new meters. The pro-

servation); Jewish Community Center of Rhode Island (citing increased planning effectiveness based on knowledge of actual water consumption and benefit of catching water leaks more

quickly). Other supporters included the West End Community Center, Inc., the DaVinci Center for Community Progress, Inc., and Concerned Citizens of Mount Pleasant.

priety of including or excluding a given IFR expenditure under the Comprehensive Clean Water Infrastructure Act of 1993 is one of first impression for this Court.

As we have noted, petitioner's application upon which the PUC rendered its 1995 order had categorized the AMR installation cost, including meter replacements, as a capital expenditure rather than as a line item on the PWSB's draft version of its five-year IFR plan. On the basis of that proposal the PUC authorized petitioner to collect $400,000 in revenues from its ratepayers to service the debt incurred by issuing at least $4 million in revenue bonds to begin its meter upgrade using the ARB technology. The PUC admonished:

"The [PUC] has decided to treat the PWSB's meter replacement (CIP) [Capital Improvement Plan] expense and IFR expense as a single expense issue. * * * Albeit, we are treating the PWSB's meter replacement and IFR expenses as a single expense issue, we direct the PWSB to not treat the respective funding for each interchangeably. For example, *we do not authorize the PWSB to use any of the IFR funding authorized herein for its meter replacement costs.*" (Emphasis added.)

Subsequent to the PUC's 1995 order, however, petitioner amended its five-year IFR plan to include approximately $4.5 million for meter replacements. The amended plan was submitted to the health department for approval pursuant to G.L.1956 § 46–15.6–5. In response to petitioner's proposal on reconsideration that meter-replacement costs be included as an IFR expense, the PUC concluded, as noted *ante*, that because "we included the costs of new meters in our ARB system upgrade and repair allowance, * * * *there is no need* to authorize the use of IFR monies for this purpose." (Emphasis added.)

■ It appears that the PUC's reasoning resulted from a misconception of the requirements of the Comprehensive Clean Water

Infrastructure Act of 1993, which provides in pertinent part that:

"The department [of health] shall coordinate expeditious review of components prepared by water suppliers subject to this chapter. Upon receipt of components prepared by water suppliers under this chapter * * * the *public utilities commission* (for those water suppliers within its jurisdiction) *shall have one hundred and twenty (120) days to review the components and submit comments thereon to the department.* Upon consideration of written comments by all agencies designated herein the *department shall determine whether the component complies with the requirements of this chapter.*" Section 46–15.6–5(d). (Emphases added.)

"It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996). The record contains no evidence that the PUC, either within 120 days of petitioner's February 1996 submission of the final five-year IFR plan to the health department or at any time prior to the November 18, 1996 order, presented any comments to that department in respect to the inclusion of meter-replacement costs. Moreover, because § 46–15.6–5(d) expressly reserves to the State Department of Health the authority to determine whether a submitted plan complies with the chapter and because the instant five-year plan was approved by operation of law on or about October 29, 1996,[9] the PUC was in no position to question or to contest that determination in November 1996 by concluding that "there [was] no need" to use IFR funds for meter replacements.

The PUC was aware that petitioner's 1995 IFR submission was a draft and that the requisite health department approval had not yet been sought. In addition, petitioner had projected the need for over $15 million for

---

9. The record is devoid of any evidence that the State Department of Health notified the PWSB of any determination regarding its February 29, 1996 IFR submission. Section 46–15.6–5(d) provides that "[f]ailure by the department [of health]

to notify water suppliers of its determination within [eight months of the submission of the component] *shall constitute approval.*" (Emphasis added.)

meter replacements in its twenty-year IFR plan draft, which the PUC also possessed. Moreover, the propriety of including meter-replacement costs as part of a water-supply-management plan is clearly recognized by statute. Specifically, G.L.1956 § 46–15.4–3 provided in pertinent part:

"**Content of water supply management plans.—**

\* \* \*

(b) A water supply management plan shall include, without limitation:

\* \* \*

(5) System management measures to insure that the following elements are optimally operated and maintained, including: leak detection and repair; *meter installation and replacement;* and frequency of reading meters." [10] (Emphasis added.)

At the time of the PWSB's final IFR submission to the health department, § 46–15.6–5(b) required petitioner to file a copy of its IFR component with the department "only to the extent the components differ from plans filed under § 46–15.4–3."

We therefore conclude that the PUC exceeded its authority by denying IFR funds for meter replacements consistent with the PWSB's Department of Health-approved IFR plan. We do not intend by our holding, however, to minimize the PUC's concern over the long-neglected infrastructure of the PWSB's water-distribution system. Given the claim of petitioner's general manager and chief engineer, Richard O. Rafanovic (Rafanovic), expressed in the PUC's 1995 order, that "the replacement of obsolete physical and functional components of the treatment, storage and distribution systems [is] essential to protect the public's health and safety,"

and given the water system's well-documented infrastructure problems,[11] the PUC's concern that the depletion of IFR funds for meter replacements might delay other necessary infrastructure repair and maintenance was understandable. Such a concern is apparent in the Legislature's pronouncement that

"The decay of infrastructure and related construction due to deterioration or functional obsolescence can threaten the quality of supplies and, therefore, can endanger public health; thus it is necessary to take immediate and continuing steps to repair and replace the infrastructure used to deliver water supplies in order to restore water system facilities." G.L.1956 § 46–15.6–2(5).

The importance of this issue was recognized in the following dialogue during the 1996 hearing on the motion for reconsideration:

"[PUC Presiding Commissioner:] Is it your testimony that you'll preserve and protect the health, safety and welfare of Providence [*sic*] at all times?

"[Rafanovic:] Absolutely.

"[PUC Presiding Commissioner:] And in so doing will not neglect the system in order to provide for this Commission considering the AMR system?

"[Rafanovic:] Absolutely."

### Weight of the Evidence

In view of the foregoing discussion, we are led to conclude that the PUC's majority opinion was not fairly, substantially, and reasonably supported by legally competent evidence. Consequently, the PWSB's revised proposal should have been granted. We cite

**10.** General Laws 1956 § 46–15.4–3 was repealed by P.L.1997, ch. 360, § 1. The provisions of the statute cited herein were then codified at § 46–15.3–5.1(C)(1)(e) pursuant to P.L.1997, ch. 360, § 2. Section 46–15.6–5(b) was amended to reflect the change. P.L.1997, ch. 37, § 1.

**11.** For example, in its final IFR plan submission to the Department of Health, the PWSB referred to "the ongoing deterioration of infrastructure" and noted that the intent of the plan was "to replace aging and deteriorating water system facilities." Among observations included in the IFR plan were the following: "[A]lmost thirty percent (30%) of [the transmission and distribu-

tion] facilities date back before the turn of the century"; "[m]any of the mechanical components of the treatment plant and the pumping stations are so old that replacement parts are no longer available and have to be specially manufactured when failure occurs"; "[t]he existing central control board which monitors and controls the operation of the treatment plant and remote facilities dates back to the 1960s and is obsolete"; "[t]he electrical transmission equipment and substation feeding the treatment plant date back to their original installation in the 1920s and are obsolete, unsafe and unreliable."

with approval the conclusions of Commissioner Paul E. Hanaway, the dissenter in the two-to-one PUC 1996 order, who wrote:

"I have dissented from the majority in this decision based upon my sincerest belief that AMR technology is not only superior to ARB technology, but that an AMR meter reading system will better serve the present and future interests of the PWSB's and the Narragansett Bay Commission's ratepayers. An AMR meter reading system will provide these utilities with more accurate and more frequent meter readings. These benefits will invariably augment cash flow for these utilities and reduce, if not eliminate, the current level of billing errors. Moreover, an AMR system will also provide ratepayers with timely consumption data which ratepayers can use to better understand and control their [water] usage. This Commission has provided the Providence Gas Company with funding sufficient to operate an AMR meter reading system. The Providence Gas Company's AMR program has been an unqualified success."

12. In its 1995 order, the PUC maintained: "We have repeatedly provided money to fully fund the PWSB's capital improvement requests. We have consistently fully funded all debt service requests. Despite this effort, we are frustrated that necessary system improvements have not been made." *See also Providence Water Supply Board v. Malachowski*, 624 A.2d 305, 308 (R.I.1993) (affirming PUC order which "ordered various measures to control the PWSB's financial misfeasance"). Among the PUC's findings in *Malachowski* were determinations that "the PWSB violated certain requirements mandated under [a previous PUC order], had fiscally mismanaged itself, and was solely responsible for its own revenue deficiencies." *Id.* Moreover, the PUC found that "[t]he PWSB exceeded its authorized operations and maintenance account by $5,454,175 * * * [and] applied funds earmarked for restricted accounts toward an unauthorized increase in its operations and management budget. It made matters worse * * * by increasing its total staff by 21 percent and by providing significant raises to its employees." *Id.* This Court concluded, "In light of its budgetary legerdemain we find the PWSB's argument that its filing [for a surcharge tariff] is aimed solely at remedying a revenue shortfall to be pure sophistry." *Id.* at 311.

13. Available data suggests that the problems often attributed solely to the PWSB management may have their genesis—at least in part—elsewhere. For example, after conducting a comprehensive management and operational study of

The evidence unequivocally established that the PWSB's revised AMR modernization proposal provided for the implementation of an indisputably superior meter reading technology within the parameters of the rate schedule approved by the PUC. Furthermore, the modernization, which received overwhelming support from organizational representatives of the rate-paying public, would not deter the infrastructure maintenance and repair needed to ensure public health and safety. Moreover, expenditures for meter replacements (to be incurred *notwithstanding which technology* the PWSB utilized) were approved as part of a plan reviewed, inter alia, by the State Department of Health—a plan on which the PUC failed to exercise its statutory right to comment.

To the extent that the PUC's 1996 order restricting expenditures was influenced by allegations of mismanagement that have plagued the water utility in recent years,[12] we acknowledge the PUC's concern to proceed cautiously, given its charge of ensuring that ratepayers are not adversely affected by a utility's expenditure choices.[13]

the PWSB at the mandate of the PUC, Vista Consulting Group, Inc. (Vista), an independent firm, concluded in a 1994 report that:

"the most fundamental change that is needed at PWSB is increased autonomy from the City of Providence. The current system by which the utility is governed, where the City retains considerable control over the operations and finances of the Water Supply Board, but where cost and quality of service are regulated by the [PUC], is not workable. PWSB is caught in the 'worst of all possible worlds.' It is not a classic regulated monopoly, and therefore does not accrue the benefits of a rate of return on investment which all investor-owned utilities receive. It also is not a municipal utility, because it is controlled by the City, but regulated by the [PUC]. The result of this 'hybrid' role has been a lack of operating flexibility and insufficient revenue generating capabilities, which has led to the current deteriorated state of the utility."

Vista further observed:

"The current atmosphere of confrontation and criticism [between the PUC and the PWSB] badly needs to be transformed into cooperation if PWSB is to successfully meet the many challenges in front of it. * * * An 'unvirtuous circle' has * * * developed—the utility, because of inadequate revenues, has been unable to perform many basic functions of a modern water utility. As a result, the backlog of de-

## Conclusion

The Public Utilities Commission's 1996 order was unreasonable and was not fairly and substantially supported by the evidence. Accordingly, for the reasons stated herein, the Providence Water Supply Board's petition for certiorari is granted. The order of the Public Utility Commission directing the Providence Water Supply Board to install ARB technology is quashed. The records certified to this Court are remanded to the Public Utility Commission with our decision endorsed thereon and with our direction that an appropriate order be entered by the Public Utility Commission in accordance with this opinion.

BOURCIER, J., did not participate.

ferred maintenance grows, the utility becomes more inefficient and less able to develop an adequate planning function, and the [PUC] therefore becomes even less inclined to grant the rate increases which are needed to halt the downward spiral."