## In re KENT COUNTY WATER AUTHORITY CHANGE RATE SCHEDULES.

### No. 2009–41–M.P.

Supreme Court of Rhode Island.

June 17, 2010.

Joseph J. McGair, Esq., Warwick, for Kent County Water Authority.

Leo J. Wold, Department of Attorney General, for The Division of Public Utilities and Carriers.

Peter D. Ruggiero, Esq., for Intervenor City of Warwick.

Present: SUTTELL, C.J., GOLDBERG, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on March 10, 2010, as a statutory petition for certiorari filed by the petitioner, the Kent County Water Authority (KCWA or petitioner), pursuant to G.L. 1956 § 39-5-1.[1] The petitioner is seeking review of a decision by the Rhode Island Public Utilities Commission (PUC) denying a rate increase to KCWA for several discrete expenses: a salary increase that was less than initially requested, full funding for its infrastructure-replacement program (IFR), and the PUC's determination that KCWA employees should pay a portion of their health-insurance expenses. The City of Warwick (city) intervened before the PUC and is a party to this appeal. The petitioner seeks review of the report and order that the PUC issued in docket No. 3942. After careful review of the record in this case, we affirm.

## Regulatory Structure

■ We begin by noting the distinction between the Division of Public Utilities and Carriers (division) and the PUC. The division is legally and functionally separate from the PUC. As set forth in G.L.1956 § 39-1-3, the General Assembly established the PUC and the division, designat-

1. General Laws 1956 § 39-5-1 provides for review by certiorari by our Court of all orders made by the PUC:

    "Any person aggrieved by a decision or order of the commission may, within seven (7) days from the date of the decision or order, petition the [S]upreme [C]ourt for a writ of certiorari to review the legality and reasonableness of the decision or order. The petition for a writ of certiorari shall fully set forth the specific reasons for which it is claimed that the decision or order is

    unlawful or unreasonable. Chapter 35 of title 42 shall not be applicable to appeals from the commission. The procedure established by this chapter shall constitute the exclusive remedy for persons and companies aggrieved by any order or judgment of the commission; provided, however, any person aggrieved by a final decision or order of the administrator may appeal therefrom to the [S]uperior [C]ourt pursuant to the provisions of § 42-35-15."

ing the PUC as a quasi-judicial tribunal and the division, which exercises powers not specifically assigned to the PUC. Specifically, those powers include implementing the policies of the state in regulating the public utilities to achieve the "ultimate policy goals of providing for adequate, efficient, and economical energy, communication, and transportation services and water supplies at just and reasonable rates." *Providence Gas Co. v. Burke,* 419 A.2d 263, 269 (R.I.1980). We further have elaborated on the distinction between the PUC and the division in *Narragansett Electric Co. v. Harsch,* 117 R.I. 395, 402, 368 A.2d 1194, 1199–1200 (1977):

"[T]he General Assembly intended by its enactment to segregate the judicial and administrative attributes of ratemaking and utilities regulation and to vest them separately and respectively in the [PUC] and the [division]. Other provisions in title 39 support this interpretation. For instance, the [PUC] is clothed with the 'powers of a court of record' in determining and adjudicating matters within its jurisdiction * * *. It is further empowered to make orders and render judgments and to enforce the same by suitable process * * *."

This Court has noted these differences in a number of subsequent cases. *See, e.g., In re Island Hi–Speed Ferry, LLC,* 746 A.2d 1240, 1244 n. 6 (R.I.2000) ("The [d]ivision, which is represented by the Department of the Attorney General in all administrative and legal proceedings, is statutorily charged with representing the interests of the public, as its advocate, in rate proceedings before the [PUC]."); *Town of New Shoreham v. Rhode Island Public Utilities Commission,* 464 A.2d 730, 737 n. 5 (R.I.1983) (noting that although the administrator of the division had approved an agreement, the PUC has "exclusive jurisdiction to determine the rates of public utilities").

### Facts and Travel

On March 31, 2008, KCWA filed a rate application with the PUC seeking an overall rate increase of $5,464,556, or 35 percent; if approved, this would have resulted in a rate increase of 16.5 percent for private customers. Included in its rate application, were the following proposed items: a 4 percent wage increase for employees' salaries; $6 million for the IFR plan; and a salary and benefit structure that continued to relieve their employees of any contribution toward their health-care premiums. It is the PUC's determination of these items that is the subject of this appeal.

Before the public hearings, as is customary in rate cases, the parties submitted prefiled testimony. The division presented evidence from its utility rate consultant, Thomas Catlin (Catlin), who recommended a salary increase of 3.2 percent, as opposed to the requested 4 percent.[2] With regard to the health-insurance contribution, Catlin testified that 90 percent of the cost of health insurance should be paid through water rates and that employees should contribute 10 percent of the cost of their health-care premiums. Finally, Catlin indicated that the IFR plan should be funded at $5.4 million, rather than the $6 million that had been requested. According to Catlin, the $5.4 million still would suffice to cover the KCWA's IFR plans.

There was also prefiled testimony from Timothy Brown (Brown), the general man-

---

**2.** There was a data request from the PUC, which indicated that KCWA employees had received salary increases of approximately 23 percent over the past five years. Specifically, the salary increases were 5.7 percent in 2004; 4 percent in 2005; 3.7 percent in 2006; 6.4 percent in 2007; and 3.2 percent in 2008.

ager of KCWA. With respect to the salary increase, Brown averred that KCWA was understaffed and that to retain the utility's current employees, an adequate salary increase was necessary. Brown rejected the division's suggestion that the KCWA employees pay for a portion of their health-insurance premiums because, he argued, doing so would hinder petitioner's ability to attract and retain qualified employees. Finally, with respect to the IFR, Brown suggested that funding the IFR plan at a reduced amount of $5.4 million was irresponsible. Additionally, Christopher Woodcock (Woodcock), a rate consultant for KCWA, also in prefiled testimony, addressed the IFR and declared that the safety of the water supply for its users, as well as infrastructure concerns, should outweigh the economic considerations that the division suggested.

The PUC conducted hearings on July 10, 2008, and September 24, 2008. Brown testified and expanded upon his prefiled testimony that the Department of Health (DOH) had approved the IFR plan and that KCWA anticipated a rate increase to pay for that plan. Brown testified that IFR plans are funded through a cash account, as opposed to capital programs, which are financed through bonds. He also explained that it was petitioner's policy that KCWA will not undertake an IFR project until the full amount is available in the account. In response, Catlin, testifying for the division, stated that the KCWA funding for IFR projects was conservative and that other utilities in Rhode Island tend not to accrue that much cash for IFR projects. Catlin recommended that the IFR funding be increased to $5.4 million rather than the $6 million. He noted that

even at $5.4 million for IFR funding, KCWA would still have $18.1 million in IFR funds and $21 million in capital improvement funds for FY 2009 and FY 2010, which coincided with KCWA's spending plan.

On October 17, 2008, the parties filed post-hearing memoranda. When addressing the health-care costs, KCWA argued that it should not be penalized because its work force was not unionized. The petitioner contended that it would be unfair to require its employees to pay for health care at the same time the employee salary increase was limited to 3.2 percent.

On January 23, 2009, the PUC issued its report and order and allowed a revenue increase of $3,423,233 or 20.91 percent. The PUC granted a rate increase for IFR funding to a level of $5.4 million, as opposed to the $6 million level that the utility requested. Further, the PUC accepted the division's recommendation that a 10 percent employee contribution toward health-care premiums should be instituted by KCWA. However, should KCWA elect to continue to fund 100 percent of its employee health care, the PUC ordered that the additional amount be derived from the operating-revenue-allowance account. The PUC also admonished petitioner that "reducing health care costs is becoming more prevalent throughout the public sector" and further, that the PUC's "policy has been made clear [to KCWA] for almost four years and the time has come for all regulated utilities to implement the policy." [3]

Respecting the proposed salary increase, a majority of the PUC limited rate funding to a 2 percent raise for KCWA employees;

3. The PUC also noted that the Providence Water Supply Board, the Pawtucket Water Supply Board, the Newport Water Division, and the Woonsocket Water Department all have a policy in place to require their employees to pay a portion of health care premiums and that the PUC's expectation is that employees will co-share their health-care premiums.

however, the PUC noted that its decision does not preclude KCWA from granting a higher salary increase. Although KCWA initially sought a 4 percent salary increase, it agreed to the 3.2 percent raise that the division recommended. The order provided that should KCWA provide a 3.2 percent increase, the money would come from petitioner's operating-revenue-allowance account. In explaining its decision, the PUC referenced the current malaise in Rhode Island's economy, including the state's high unemployment. The PUC cited *Harsch*, 117 R.I. at 416, 368 A.2d at 1206–07, in which this Court declared that, in determining whether utility rates are just and reasonable, the PUC may consider local economic conditions.

PUC Chairman Elia Germani (Germani) dissented from the portion of the majority opinion just referred to on the ground that he considered the majority's view to be a misreading of *Harsch* as it pertains to economic conditions. Mr. Germani also emphasized that KCWA is the only utility in Rhode Island that is not unionized; it was his opinion that this should be factored into the salary increase at issue in the rate filing.[4]

## Standard of Review

The General Assembly has established the standard of review for cases brought before us in accordance with title 39 of the General Laws, entitled "Public Utilities and Carriers." Specifically, the Legislature declared:

"The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission and the [S]upreme [C]ourt, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39–5–3.

When assessing a decision of the PUC, our mission is to determine whether the PUC ruled in a "lawful and reasonable" manner and whether its findings of fact are "fairly and substantially supported by legal evidence." *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 446 A.2d 1376, 1380 (R.I. 1982). Moreover, we accord great deference to the PUC's factual findings, *Roberts v. Narragansett Electric Co.*, 490 A.2d 506, 507 (R.I.1985), and we will not disturb an order unless the PUC "clearly exceeds its statutory authority or acts illegally, arbitrarily, or unreasonably." *Narragansett Electric Co. v. Public Utilities Commission*, 773 A.2d 237, 240 (R.I.2001). In applying this standard to the issues before us, we recognize that in seeking to overturn a finding of the PUC, the petitioner has a difficult burden to bear. *In re Providence Water Supply Board's Application to Change Rate Schedules*, 989 A.2d 110, 115 (R.I.2010).

## Analysis

Before us, KCWA assigns three errors in the PUC's decision and order that it

---

4. Specifically, Germani stated:
"The KCWA is the only utility in RI that does not have a union. The [PUC] should acknowledge that if a union becomes the bargaining agent for KCWA's employees, this decision would impair the flexibility necessary for the efficient operations of the company. In my judgment, the end result would be to deny the KCWA an important method for achieving efficient operations of the company. It is well known that a company which is unionized is less efficient, and therefore, it costs the company more money to operate. Thus, the majority in my judgment, is being 'penny wise and dollar foolish' if it fails to grant the utility the flexibility it needs to be efficient."

contends warrant reversal: the refusal to fully fund the IFR account; the reduced salary increase for KCWA employees; and the requirement that employees contribute 10 percent for health-care premiums. We shall address each of these contentions in turn.

### Infrastructure Replacement Funding

■ The petitioner asserts that it was error for the PUC to reject its request for full funding of the IFR as approved by the DOH based on petitioner's Clean Water Infrastructure replacement program. The petitioner argues that in limiting its funding for this program to an increase of $5.4 million—as opposed to the requested $6 million—the PUC ignored the Comprehensive Clean Water Infrastructure Act of 1993 (CCWIA), as set forth in G.L.1956 § 46–15.6–2. Essentially, petitioner contends that because the DOH previously had approved its IFR plan, it was incumbent upon the PUC to grant the rate increase necessary to execute the plan. In its brief, petitioner points to § 46–15.6–6(1), which provides:

"cost of programs to implement infrastructure replacement shall be paid by the water users at a rate directly proportionate to the users' water consumption. The charges shall be limited to those necessary and reasonable to undertake the actions required by this chapter." [5]

The PUC responds that the CCWIA does not limit its express mandate to "relieve ratepayers of funding requests that produce unjust and unreasonable rates" because, it contends, the CCWIA can be read harmoniously with the PUC's responsibility to protect the public against "improper and unreasonable rates, tolls and charges[.]" Section 39–1–1(c). We agree with the PUC and reject petitioner's argument.

It is clear to us that the PUC accepted Catlin's testimony that the recommended amount was more than adequate to fund the IFR projects that were planned by KCWA. Before the PUC, Catlin testified that KCWA's funding policy for its IFR plan was more conservative than most public utilities in the state because it required that its cash accounts be fully funded before undertaking an IFR project. In its order, the PUC concluded that, "it is highly improbable that the utility would expend the authorized funds within the rate year."

The petitioner contends that the PUC should approve the requested rate for IFR projects that previously had been approved by the DOH, without examining the rate application. Essentially, KCWA is asking this Court to declare that § 46–15.6–6 has cabined the statutory authority of the PUC as set forth in § 39–1–1(c). [6]

---

5. We note that as of November 12, 2009, the General Assembly changed G.L.1956 § 46–15.6–6(1), and removed the following language: "at a rate directly proportionate to the users' water consumption." This amendment does not the affect the outcome in this case. *See* P.L.2009, ch. 288, § 9.

6. General Laws 1956 § 39–1–1(c) provides:
   "To this end, there is hereby vested in the [PUC] and the [division] the exclusive power and authority to supervise, regulate, and make orders governing the conduct of companies offering to the public in intrastate commerce energy, communication, and transportation services and water supplies for the purpose of increasing and maintaining the efficiency of the companies, according desirable safeguards and convenience to their employees and to the public, and protecting them and the public against improper and unreasonable rates, tolls and charges by providing full, fair, and adequate administrative procedures and remedies, and by securing a judicial review to any party aggrieved by such an administrative proceeding or ruling."

■ "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001) (citing *Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1050 (R.I. 1994)). Additionally, "[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Waterman v. Caprio*, 983 A.2d 841, 844 (R.I.2009) (quoting *Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island*, 943 A.2d 1045, 1049 (R.I.2008)).

Section 46–15.6–6(1) provides that "[t]he charges shall be limited to those *necessary and reasonable* to undertake the actions required by this chapter." (Emphasis added.) It is clear to us that the statute is unambiguous and that by providing that the costs of the program shall be derived from the ratepayers, but shall be limited to necessary and reasonable charges, the General Assembly did not intend to divest the PUC of its statutory authority to protect the public from "improper and unreasonable rates, tolls and charges[.]" Section 39–1–1(c). The language in these two statutes is not in conflict and, indeed, can be read harmoniously as consistent with the Legislature's design that the PUC perform its statutory authority to review rate cases and protect the public from unreasonable charges. *See Horn v. Southern Union Co.*, 927 A.2d 292, 295 (R.I.2007) ("It is an especially well-settled principle of statutory construction that when, as here, 'we are faced with statutory provisions that are *in pari materia*, we construe them in a manner that attempts to harmonize them and that is consistent with their general objective scope.'") (quoting *State v. Dearmas*, 841 A.2d 659, 666 (R.I. 2004)); *Providence & Worcester Railroad Co. v. Pine*, 729 A.2d 202, 208 (R.I.1999) (stating that statutes should be considered "as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections"); *State v. Timms*, 505 A.2d 1132, 1135 (R.I. 1986) ("We assume the Legislature intended statutes relating to the same subject be construed together to be consistent and to effectuate the policy of the law. * * * Statutes *in pari materia* are to be considered harmoniously by this [C]ourt.").

■ Finally, KCWA argues that *Providence Water Supply Board v. Public Utilities Commission*, 708 A.2d 537 (R.I.1998) controls the result in this case. In *Providence Water Supply Board*, this Court held that the PUC exceeded its authority by interfering with management functions concerning the selection of the technology employed by the water utility and that the PUC could not prohibit the utility from using IFR funds to purchase and install new water meters. *Id.* at 543, 547. Notably, this Court has declared:

"This Court repeatedly has held that the broad regulatory powers of the PUC ordinarily do not include the authority to dictate managerial policy. *See, e.g., Blackstone Valley Electric Co. v. Public Utilities Commission*, 543 A.2d 253, 255 (R.I.1988) ('It is the function of the PUC to regulate a utility in order to determine that its rates are fair and reasonable. It is not the function of the PUC to manage the utility or to exercise the prerogatives of ownership')." *Providence Water Supply Board*, 708 A.2d at 543.

Before this Court, counsel for KCWA valiantly argued that the decision in this case is infected with the same errors the PUC committed in *Providence Water Supply Board*. We respectfully disagree. In

that case, we concluded that the PUC attempted to dictate the type of technology the utility could purchase and utilize for its IFR plan and did so in light of its own determination that the new technology for meter reading was too expensive.[7] *Providence Water Supply Board,* 708 A.2d at 543. Here, the PUC, in a carefully reasoned decision, determined the appropriate funding level for the IFR program and how much the ratepayers should bear on an annual basis. The PUC did not order how KCWA was to implement its IFR plan, nor did it dictate or prioritize the projects KCWA might elect to complete. The record before us does not support, in any way, the conclusion that the PUC intruded on the managerial prerogatives of the utility, and we decline to hold otherwise. Finally, we are satisfied that the $5.4 million award for IFR funding is supported by the substantial evidence in the record before this Court.

### Salary Increases

■ The petitioner next asserts that the PUC erred when it denied its requested rate increase for employee raises. The KCWA contends that it initially requested a 4 percent raise and that the PUC's 2 percent increase clearly was erroneous. Conversely, the PUC alleges that petitioner has misconstrued its order, in which it "permitted KCWA to grant its employees a full 3.2% salary increase," but required that the money must come from its operating revenue allowance and labor expense account, but not from a rate increase. The

order provided that: "[t]he impact of the [PUC's] decision on KCWA's final position (3.2 percent increase) is a reduction to rates of approximately $25,000, including the related adjustment to the O & M Reserve, or 0.13 percent of the total rate year cost." In short, the PUC argues that it simply determined the manner in which the KCWA could fund the raises with approximately one-third of the increase to come from the operating revenue. The PUC contends that this decision falls within its discretion and was both fair and reasonable in light of the evidence presented. We agree with this contention and are guided by our well established standard of review.

This Court consistently has declared that "a party challenging a rate that the [PUC] approves must overcome the presumption that the [PUC's] conclusions are reasonable unless shown otherwise by clear and convincing evidence." *Providence Water Supply Board v. Malachowski,* 624 A.2d 305, 309 (R.I.1993). Here, KCWA's argument that it was denied full funding of a proposed salary increase is rejected because there is insufficient evidence in the record to support this contention. Rather, the salary increase as approved by the PUC is supported by substantial evidence. *See New England Telephone & Telegraph Co.,* 446 A.2d at 1380. The petitioner has failed to demonstrate by clear and convincing evidence that the PUC's decision was unreasonable.[8] In sum, there is no suggestion in

---

7. Specifically, the Court in *Providence Water Supply Board v. Public Utilities Commission,* 708 A.2d 537, 540 (R.I.1998) stated:

    "Opining that 'the costs related to [the AMR system] of consumption recording cannot be taken lightly,' the PUC concluded that AMR technology was too expensive. The PUC's 1995 order did authorize the PWSB to collect $400,000 in additional revenues from its ratepayers in order to service the

debt incurred by issuing at least $4 million in revenue bonds. The PUC further mandated that [the] petitioner use the $4 million to begin its meter-system upgrade using the ARB technology."

8. We also note that the division described two funding amounts for KCWA's operating-revenue-allowance account—1.5 percent of the rate or, alternatively, 3 percent funding. The

the record before us that the PUC "exceeded its authority or acted illegally, arbitrarily, or unreasonably." Section 39–5–3.

### Health–Insurance Premiums

The petitioner next asserts that the PUC erred in ordering KCWA employees to contribute 10 percent of their health-care premiums and that this decision was not supported by legally competent evidence. Specifically, KCWA asserts that G.L.1956 § 39–16–5 bars the PUC from recouping from ratepayers only 90 percent of its expenditures for health insurance. However, in its report and order, the PUC noted that petitioner could elect to relieve their employees from a 10 percent contribution toward their health insurance, but it must do so from the operating-revenue-allowance account. Before this Court, the PUC contends that § 39–16–5 does not preclude it from setting rates based on a formula that requires 10 percent of health-insurance expenses to be paid by employees.

Section 39–16–5, part of the enabling legislation creating KCWA, authorizes its board to appoint employees and to fix their compensation. Section 39–16–5 provides in relevant part:

> "The board may provide, in the fixing of compensation, for a retirement program, commonly known as a pension plan, funded by individual or group insurance or annuity contracts or otherwise, for health and accident insurance, for life insurance, for hospital service commonly known as blue cross, and for physicians service for any one or more or all of its employees; and the board is hereby authorized to expend the moneys of the authority for such purposes and pro-

grams as it may deem advisable. These programs and purposes may be financed in full or in part by the moneys of the authority."

The petitioner contends that it solely is vested with the authority to set employee compensation, including health insurance. However, fixing compensation and setting utility rates are separate and distinct functions. We reject petitioner's suggestion that the PUC is divested of the authority to determine what cost should be borne by the ratepayers. There is nothing in § 39–16–5 remotely suggesting that the PUC is without authority to determine what expenses are just and reasonable for the ratepayers to bear.

Additionally, the PUC asserts that KCWA has been on notice for some time that the PUC intended to implement this modest change in the allocation of health-care costs. As early as 2005, the PUC issued order No. 18316, in which it stated that "KCWA should take heed of a recent [PUC] order * * * in which the [PUC] expressed its expectation that the utility 'would require its employees to share in the expense of their health care premiums or implement other approaches that will clearly reduce the health care premiums paid' by the utility." The record discloses that the PUC advised KCWA to begin requiring its employees to contribute to a portion of their health-care premiums, similar to what is required at many public utilities in this state. The petitioner expressly ignored that directive.

■ There is nothing in the record before us demonstrating that the PUC was unreasonable or arbitrary; in fact, the PUC has applied its balancing analysis for KCWA's health-care costs in the same

---

PUC elected the alternate amount and attached the conditions recommended by the division. The conditions recommended by

the division were designed to ensure that petitioner maintained sufficient funding in case the utility suffered a decline in revenue.

manner as every other public water utility in the state. The PUC noted that the Providence Water Supply Board, the Pawtucket Water Supply Board, the Newport Water Division, and the Woonsocket Water Department all require their employees to pay a portion of health-care premiums. We see no valid reason why petitioner should not be required to act similarly. The PUC order stated: "The [PUC] notes that this stated [PUC] policy has been made clear for almost four years and the time has come for all regulated utilities to implement the policy." The petitioner's own witness, Mr. Brown, agreed that he was aware that employee co-sharing was becoming more prevalent. Additionally, when addressing whether a unionized workforce had an impact on its decision, the PUC found: "every other regulated water utility in Rhode Island, union and non-union, require an employee health care premium co-share to the point where a utility reopened negotiations with its union to obtain a co-share."

 The PUC's findings are "presumed reasonable 'until shown to be clearly, palpably and grossly unreasonable by clear and convincing evidence.'" *Providence Gas Co. v. Malachowski*, 600 A.2d 711, 714 (R.I.1991) (quoting *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 116 R.I. 356, 377, 358 A.2d 1, 15 (1976)). The PUC's decision that the ratepayers should not shoulder 100 percent of employee health-insurance premiums is not unreasonable; indeed, it is prudent and responsible and represents the slow dawn of a new day in the public benefits arena. The decision also is supported by substantial evidence, including the fact that most, if not all, public water utilities require their employees to contribute toward their health insurance. We uphold the decision of the PUC.

## Conclusion

For the reasons stated, we quash the writ and affirm the report and order of the Public Utilities Commission. The records certified to this Court are remanded to the Public Utilities Commission with our decision endorsed thereon.

Justice FLAHERTY did not participate. Justice INDEGLIA took no part in the consideration or decision of this appeal.