DECISION
This case is before the Court on appeal from a Report and Order (Report and Order) of the Division of Public Utilities and Carriers of the State of Rhode Island (Division). The appellants, Interstate Navigation Company (Interstate) and the Town of New Shoreham (New Shoreham), are seeking reversal of a Report and Order of the Division that imposed a moratorium prohibiting Interstate from engaging in the high-speed ferry market between the mainland and Block Island for three years beginning May 1, 2000; at the end of the three-year moratorium, required Interstate if it desired to operate a high-speed service to apply to the Division to provide such ferry service only upon showing that the public convenience and necessity would be served; allowed the Island Hi-Speed Ferry, LLC (Hi-Speed Ferry or IHSF) upon approval of Interstate's application to petition the Division to repeal the condition requiring Hi-Speed Ferry to operate at a round-trip rate of $26.00; and assessed a $22,000 fine on Interstate for the refusal of its President to answer questions posed to her by the Hearing Officer. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS/TRAVEL
Hi-Speed Ferry filed an application with the Division for a Certificate of Public Convenience and Necessity to operate a ferry service from Galifee, Rhode Island to Block Island, Rhode Island on February 20, 1998. On February 26, 1998, Interstate filed a Motion to Intervene as a full party/protestant in the licensing hearing. The Town of New Shoreham filed a separate Motion to Intervene on March 2, 1998. The Division allowed the interventions of both Interstate and New Shoreham. Extensive hearings were held on the application and the record was closed on June 26, 1998. Ultimately, the Division approved Hi-Speed Ferry's application for a water carrier certificate subject to certain conditions. The appellants then sought reversal of the Division's Report and Order granting Hi-Speed Ferry a water carrier certificate. The appeal came before this Court which affirmed the Division's grant of the certificate, but remanded the case to the agency on the issue of a reasonable period of time. Interstate Navigation Co. v. Division of Public Utilities and Carriers of R.I.C.A. Nos. 98-4804 and 4766, Aug. 31, 1999, Silverstein, J. On April 2, 1999, Hi-Speed Ferry filed a written request to the Division that it "summarily investigate" the conduct of Interstate pursuant to G.L. 1956 § 39-4-13. Hi-Speed Ferry's petition contended that Interstate had made inconsistent statements to the Division regarding its plans to enter the high-speed ferry market to Block Island. Specifically, Hi-Speed Ferry claimed that:
 "1. [i]n Division Docket No. 98-MC-16 Interstate Navigation denied under oath that it had any plans to enter the high speed ferry market to Block Island and denied that there was any public need for such service, despite substantial record evidence to the contrary.
 2. In subsequent proceedings before the Public Utilities Commission, Docket No. 2802, Interstate denied that it had the intention of entering the high speed ferry market to Block Island and argued that, in any event, it did not have the financial ability to acquire a high speed vessel.
 3. Recently, in the Superior Court Appeal of Division [D]ocket No. 98-MC-16 Interstate queried the Court in a brief: `What happens if Interstate, for example, decided to offer [high speed ferry] service in 1999, now that [Island Hi-Speed Ferry] has abandoned that effort?'"
Hi-Speed Ferry requested that if the Division found that Interstate "intends to enter the high-speed ferry market from Galifee to Block Island in 1999, or any year in the future," an order be entered pursuant to G.L. 1956 § 394-10. (Report and Order at 1 and 2.) Moreover, Hi-Speed Ferry's prayer for relief requested that the order hold:
 "1. that such activity would be unjust and unreasonable; and
 2. that Interstate be prohibited from engaging in such activity entirely, either directly or indirectly; or, alternatively,
 3. that Interstate be prohibited from engaging in such activity for a period of three years from May 1, 2000; and
 4. that if and when Interstate enters the high speed ferry market from Galifee to Block Island, that the conditions in the Division's Order in Docket No. 98-MC-16 that Hi-Speed Ferry operate at a round-trip adult-fare, and that there be a ticket price differential between Hi-Speed Ferry and Interstate to protect Interstate from customer base erosion, be automatically rescinded."
The Division forwarded the Petition to Interstate and requested a response within twenty days. On May 20, 1999, Interstate responded by filing a Motion to Dismiss, or in the alternative, a Summary Disposition of the Petition pursuant to Rule 19 (c) of the Division's Rules of Practice and Procedure. Hi-Speed Ferry filed an objection to Interstate's pleading. Thereafter, on June 11, 1999, the Division issued an Order and Notice of Hearing, scheduling the contested case for June 24, 1999.
Interstate then sought to enjoin the Division from proceeding by filing a complaint in Superior Court seeking injunctive and temporary relief. However, this Court in Interstate Navigation Company v. Division of Public Utilities and Carriers, et al., C.A. No. 99-3055, June 22, 1999, Silverstein, J., denied Interstate's motion for temporary restraining order and declaratory judgment finding that "the provisions that require the plaintiff to demonstrate irreparable harm presently threatened for which there is no adequate remedy cannot, in this case, be found." (Tr. at 40.) After reviewing the pleadings submitted by both parties, the Division found that an investigation "was necessary and in the public interest." (Report and Order at 2.)
On September 17, 1999, the Division issued an order whereby:
 "1. Interstate Navigation Company is hereby prohibited from engaging in the high-speed ferry market between the mainland and Block Island effective immediately and continuing for three years beginning May 1, 2000;
 2. That after the expiration of [the] three year moratorium, Interstate may apply to the Division to provide high-speed ferry service upon demonstrating that the public convenience and necessity would be served by Interstate's entry into the market;
 3. That, if and when the Division authorizes Interstate's entry into the high-speed ferry market, IHSF will be afforded an opportunity to petition the Division for rescinding the condition requiring IHSF to operate at a round trip rate of $26.00;
 4. That Interstate Navigation Company, through its shareholders and not ratepayers, pay a civil penalty of $22,000 for the unreasonable refusal of its President, Susan Linda, to answer twenty-two (22) separate questions after having been ordered to do so by the Hearing Officer;
 5. That Interstate hand-deliver a check in the amount of $22,000, payable to the State of Rhode Island, to the Division's offices within fourteen (14) days of the entry date of this Order." (Report and Order at 2 1-22.)
Interstate and New Shoreham thereafter filed timely appeals with the court pursuant to the state's Administrative Procedures Act. The appellants raise a number of issues on appeal, including that the Division's imposition of a three-year moratorium prohibiting Interstate from operating a high-speed ferry between Galifee, Rhode Island and Block Island, Rhode Island exceeded its statutory authority and impeded on the management rights of Interstate, or in the alternative, even if Interstate is not entitled to operate a high-speed ferry, then the Division's order should be vacated because it is unconstitutionally vague. Moreover, the appellants contend that the $22,000 fine imposed against Interstate for its representative's refusal to answer questions posed regarding Interstate's future plans to enter the high-speed ferry market was in excess of the Division's statutory authority, made on unlawful procedure, erroneous as a matter of law and arbitrary, capricious and characterized by an abuse of discretion.
 Standard of Review
This Court possesses appellate review jurisdiction of the Division's Report and Order pursuant to G.L. 1956 § 42-35-15 which provides in pertinent part:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise discretion."
When reviewing a decision of an agency, a justice of the Superior Court may not substitute his or her judgment for that of the agency board on issues of fact or as to the credibility of testifying witnesses where substantial evidence exists on the record to support the board's findings. Mercantum Farm Corp. v. Dutra, 572 A.2d 286, 288 (R.I. 1990) (citing Leviton Mfg. Co. v. Lillibridge, 120 R.I. 283, 291, 387 A.2d 1034, 1038 (1978)); Center for Behavioral Health, Rhode Island, Inc. v. Barros710 A.2d 680, 684 (R.I. 1998); Baker v. Department of Employment and Training Board of Review, 637 A.2d 360, 366 (R.I. 1294) (citing DePetrillo v. Department of Employment Security 623 A.2d 31, 34 (R.I. 1993); Whitelaw v. Board of Review, Department of Employment Security95 R.I. 154, 156, 185 A.2d 104, 105 (1962)).
"Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Newport Shipyard v. Rhode Island Commission for Human Rights 484 A.2d 893, 897 (R.I. 1984) (citing Caswell v. George Sherman Sand Gravel Co., 424 A.2d 646, 647 (R.I. 1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Department of Employment Security,414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council 434 A.2d 266, 272 (R.I. 1981). Thus, the Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, et al. v. Rhode Island Labor Relations Board, et al. 650 A.2d 479, 485 (R.I. 1994). Questions of law, however, are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflict of Interest Commission, 509 A.2d 453, 458 (R.I. 1986).
 Statutory Requirement of a "Regulation, Measurement Practice, Act or Service"
The Division based its order, prohibiting Interstate from entering the high-speed ferry market for three years beginning on May 2001, on the statutory authority provided in G.L. 1956 § 39-4-10, which states that:
 "[i]f, upon a hearing and investigation had under the provisions of this chapter, the division of public utilities and caters shall find that any regulation, measurement, practice, act, or service of any public utility is unjust, unreasonable, insufficient, preferential, unjustly discriminatory, or otherwise in violation of any of the provisions of chapters 1-5 of this title, or that any service of any such public utility is inadequate or that any service which can be reasonably demanded cannot be obtained, the division shall have power to substitute therefore such other regulations, measurements, practices, service, or acts, and to make such order respecting, and such changes in the regulations, measurements, practices, service or acts, as shall be just and reasonable, and the power to order refunds as provided for in 39-3-13.1." (Report and Order at 3.)
The appellants argue that the Division exceeded the authority granted under G.L. 1956 § 39-4-10 by issuing an order predicated not on existing practices or acts of Interstate but rather on probable activities in which Interstate may be engaged in the future. "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Union Village Development Associates v. Town of North Smithfield Zoning Board of Review738 A.2d 1084, 1086 (R.I. 1999) (quoting Providence Worcester Railroad Co. v. Pine, 729 A.2d 202, 208 (R.I. 1999)). "Once having done that, our `work of judicial interpretation is at an end.'" Kelly v. Marcantonio,678 A.2d 873, 877 (R.I. 1996) (quoting DeAngelis v. Rhode Island Ethics Commission, 656 A.2d 967, 969 (R.I. 1995)).
In the instant case, the language of § 39-4-10 is clear and unequivocal. It empowers the Division to issue an order when it finds after hearing and investigation that a "regulation, measurement, practice, act, or service is unjust, unreasonable, insufficient, preferential, [or] unjustly discriminatory." However, a review of the Report and Order issued by the Division supports appellants' claim that Interstate was penalized not for any "practice, [or] act" in which it was currently engaged as required by the statute. A number of statements made by the Division in its Report and Order reveal that the Division based its order on prospective actions of Interstate.
First, the Division defined its task as "determin[ing] whether the conduct of Interstate, assuming that the Company does intend to engage in the high-speed ferry transportation market, is so unreasonable as to require the Division to intervene and grant some or all aspects contained in IHSF's prayer for relief" (Report and Order at 3.) (Emphasis added.) In addition, the Division characterized the prior testimony of Interstate's Vice-President, Joshua Linda, as "damaging" because "it revealed that the Company was actively gearing up for possible entry into the high-speed ferry market." (Report and Order at 10.) (Emphasis added.) The Division also stated that the "primary focus" of its investigation was "to determine how Interstate's potential entry in the high speed market will impact the regulatory objectives stemming from the Division's decision in Docket No. 98-MC-16." (Report and Order at 17.) (Emphasis added.) Moreover, the Division wrote that "[b]ased upon all of the intentions expressed by Interstate's upper management during the proceedings, coupled with Ms. Linda's refusal to answer the simple and straightforward questions posed by IHSF's counsel, the conclusion that Interstate intends to enter the market and compete directly against IHSF is inescapable." (Report and Order at 19.) (Emphasis added.) Finally, the Report and Order states "[t]he Division is obligated to prevent certain injury that will inure to IHSF, its ratepayers, and the public at large in the event Interstate enters the high-speed ferry market in the foreseeable future." (Report and Order at 21.) (Emphasis added.) While the goals or objectives the Division seeks to accomplish are laudable, its action of imposing a three-year moratorium prohibiting Interstate from participating in the high-speed ferry market beginning on May 2001 constitutes an abuse of discretion and exceeds its enumerated powers granted by G.L. 1956 § 39-4-10.
The appellee responds to the argument that the Division lacks specific statutory authority to prohibit Interstate from entering the high-speed ferry market by relying on the broad mandate vested in the Commission to regulate public utilities.[1] In its Report and Order, the Division noted its responsibility, as well as that of the Public Utilities Commission, "to determine how best to effectuate the legislature's goal of promoting the availability of `adequate,' `efficient' and `economical' transportation services." (Report and Order at 8.) Also, the Division found that "Interstate's market entry constitutes exactly the type of "destructive competitive practices' that the legislature sought to prevent by enacting Title 39 and empowering the Division and Commission." (Report and Order at 21.) (Citation omitted.) Thus, the appellee relies on the "additional, implied and incidental powers" provided to the agency by G.L. 1956 §§ 39-1-I and 39-1-38 to justify the Division's actions. (Hi-Speed Ferry's Brief in Response to Brief of Interstate at 40.) G.L. 1956 § 39-1-1(3)(b) provides that:
 "[i]t is hereby declared to be the policy of the state to provide fair regulation of public utilities and carriers in the interest of the public, to promote availability of adequate, efficient and economical energy, communication, and transportation services and water supplies to the inhabitants of the state, to provide just and reasonable rates and charges for such services and supplies, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices, and to co-operate with other states and agencies of the federal government in promoting and coordinating efforts to achieve realization of this policy."
Additionally, G.L. 1956 § 39-1-3 8 states that:
 "[t]he provisions of this title shall be interpreted and construed liberally in aid of its declared purpose. The commission and the division shall have, in addition to powers specified in this chapter, all additional, implied, and incidental power which may be proper or necessary to effectuate their purposes. No rule, order, act or regulation of the commission and of the division shall be declared inoperative, illegal, or void for any omission of a technical nature."
The General Assembly "vest[ed] the Commission with exclusive authority to regulate public utilities." Town of East Greenwich v. O'Neil,617 A.2d 104, 109 (R.I. 1992) (citing South County Gas Co. v. Burke551 A.2d 22 (R.I. 1988)). To this end, it is well recognized that "[t]itle 39 is replete with examples of the broad reach of the commission's authority." In re Island Hi-Speed Ferry. LLC, 746 A.2d 1240, 1244 (R.I. 2000) (quoting Town of East Greenwich v. O'Neil, 617 A.2d at 110)).
However, as Appellee Hi-Speed Ferry acknowledges the different provisions under Title 39 "must be read together so that meaning can be given to the entire statutory scheme." (Hi-Speed Ferry's Brief in Response to Brief of Interstate at 40.) When interpreting different statutory provisions, the Rhode Island Supreme Court has consistently stated that "our task here requires the interpretation of different statutory provisions in pari materia, and our goals remain that of construing laws "such that they will harmonize with each other and be consistent with their general objective scope.'" Local 400 International Federation of Technical Professional Engineers v. Rhode Island Labor Relations Board 747 A.2d 1002, 1004 (R.I. 2000) (quoting Blanchette v. Stone, 591 A.2d 785, 786 (R.I. 1991)). See also Dahl v. Begin,660 A.2d 730, 734 (R.I. 1995); State v. Ahmadjian, 438 A.2d 1070, 1081 (R.I. 1981). Thus, in the instant case, "if the DPUC holds an investigation and hearing; and, if the DPUC finds that a public utility's activity is unjust and unreasonable; then, the DPUC must have the authority under § 39-4-10 to make the appropriate order." (Hi-Speed Ferry's Brief in Response to Brief of Interstate at 40.) (Emphasis added.) As has been explained above, however, there has been no activity, that is, no "practice or act" on Interstate's part upon which the Division can base its order prohibiting Interstate's entry into the high-speed ferry market for three years.
Moreover, the Division has no inherent power to penalize Interstate by issuing an order prohibiting Interstate from the high-speed ferry market. "It is well established that administrative agencies are purely legislative creatures possessing no inherent or common-law powers." Berkshire Cablevision of Rhode Island v. Burke 488 A.2d 676, 679 (R.I. 1985). "[A]dministrative agencies are not authorized to modify the statutory provisions under which they acquired power absent clear legislative intent." Little v. Conflict of Interest Commission,397 A.2d 884, 886, 121 R.I. 232, 236 (R.I. 1979). It is outside the purview of this Court "to rewrite or amend statutes that the General Assembly enacted." Rhode Island Federation of Teachers, AFT, AFL-CIO v. Sundlun, 595 A.2d 799, 802 (R.I. 1991). In order for the Division to issue an order prohibiting Interstate from entering the high-speed ferry market, it first had to determine that Interstate was engaged in a practice or act that was unjust or unreasonable. While it is within the ambit of the Division to issue an order that provides fair regulation of public utilities and carriers in the interest of the public and that promotes the availability of adequate, efficient and economical transportation services without "unfair or destructive competitive practices," the Division must be able to refer to a practice or act committed by Interstate that triggers its actions under G.L. 1956 §§39-1-1(3)(b) and 39-4-10. In the instant case, however, the Division grounded its order on its perception of Interstate's intentions to enter the high-speed transportation market sometime in the future. In so doing, the Division acted outside the scope of the authority granted it under G.L. 1956 §§ 39-1-1(3)(b) and 39-4-10.
 Certificate of Public Convenience and Necessity
The appellants next argue that Interstate's Certificate of Public Convenience and Necessity, which was granted as a matter of right, specifies only the scope and the termini from which Interstate can operate and imposed no further limitations. Appellants urge that the Division's order prohibiting Interstate from entering the high-speed ferry market for three years commencing on May 2001 and requiring Interstate to apply to the Division after the end of the moratorium, to provide high-speed ferry service upon demonstrating that the public convenience and necessity would be served, falls outside the Division's statutory authority.
A Certificate of Public Convenience and Necessity "is a major feature of most regulatory regimes applicable to public service industries." Jones, Origins of the Certificate of Public Convenience and Necessity: Developments in the States, 1870-1920, 79 Colum. L. Rev. 426, 426 (1979). However, "certificates of public convenience and necessity differ from most forms of government licensing of business activity" in that they contain "a quantitative dimension" that takes into account the public interest. Id. at 427. "Thus, the essence of the certificate of public convenience and necessity is the exclusion of otherwise qualified applicants from a market because, in the judgment of the regulatory commission, the addition of new or expanded services would have no beneficial consequences or, in a more extreme case, would actually have harmful consequences." Id. Moreover, when a Certificate of Public Convenience and Necessity is granted it can be altered, amended or revoked only as specifically authorized by statute. United States v. Seatrain Lines, Inc. 329 U.S. 424, 433, 67 S.Ct. 435, 439 (1947).
G.L. 1956 §§ 39-3-3, 39-3-3.1, 39-3-4, 39-3-5 are the statutory provisions that deal with certificate requirements for water caters. The Legislature differentiates between new water carriers and carriers that have been providing service prior to 1954. In the case at bar, it is undisputed that Interstate began providing passenger, motor vehicle, and freight service between Galifee and Old Harbor, Block Island before 1954. Thus, it derives its authority to operate from G.L. 1956 §39-3-4, which states that:
 "[a]ny person, corporation, or authority who or which has lawfully been doing business as a common cater of persons and/or property upon water between termini within this state during a seven-year period, seasonally or otherwise, prior to April 30, 1943, and any cooperative association, which although not yet operating between its proposed termini within this state, has been formed for the purpose of providing a means of transportation by water, and which has been incorporated under the provisions of chapter 8 of title 7, prior to April 30, 1954, shall be entitled as a matter of right and without public hearing thereon, to receive a certificate of convenience and necessity from the division setting forth the scope and termini of its operation."
According to this provision, Interstate is entitled to its Certificate of Public Convenience and Necessity as a matter of right. Through this provision, commonly referred to as a grandfather clause, Interstate avoided the need to petition for a certificate as well as having to prove "that public convenience and necessity require [its] services." G.L. 1956 § 39-3-3. Moreover, it is only new caters, subject to the requirements of G.L. 1956 § 39-3-3, who are implicitly subject to constraints not only on the scope and termini of its operations but also on the myriad issues that affect the public interest. Thus, the Division's order prohibiting Interstate from entering the high-speed ferry market for three years beginning in May 2001 directly contradicts Interstate's Certificate of Public Convenience and Necessity which permits it "to transport upon water passengers and freight between Point Judith and Block Island, Rhode Island." Interstate's Certificate of Public Convenience and Necessity does not specify the type of service it must provide or the vessels that must be used. In addition, the Division's order stating that after the expiration of the three-year moratorium, Interstate may apply to the Division to provide high-speed ferry service upon demonstrating that the public convenience and necessity would be served by Interstate's entry into the market, contradicts Interstate's certificate as of right which was bestowed without a determination on the question of public convenience and necessity.
An instructive case on this point is United States v. Seatrain Lines, Inc. 329 U.S. 424, 438, 67 S.Ct. 435, 439 (1947), wherein the U.S. Supreme Court held that "§ 309 which empowers the Commission to grant certificates to water caters does not authorize the Commission to specify `the service to be rendered.'" Seatrain Lines, however, is a clearer case than the case at bar because the statute involved there specifically provided "that no terms, conditions, or limitations shall restrict the right of the cater to add to its equipment, facilities, or service within the scope of such certificate, as the development of the business and the demands of the public shall require." Id. Here the Division may impose restrictions on the types of services rendered by water caters only where the controlling statute specifically provides for such ability. In the instant case, G.L. 1956 § 39-3-4 provides that water caters like Interstate, which received its Certificate of Public Convenience and Necessity, as a matter of right, are limited only with respect to scope and termini of operations. In stark contrast, new water caters are subject to the stricter requirements of G.L. 1956 § 39-3-3, which contains "a quantitative dimension" that takes into account the public interest. It is only through assessing the public interest that the Division can justify its determination that certain types of vessels may be unnecessary in a water cater's operations. Since water caters like Interstate do not have to show that public convenience and necessity require its services, the Division exceeded its statutory authority in issuing an order that prohibits Interstate from entering the high-speed market for three years and that requires Interstate, after the moratorium ends, to apply to the Division for a Certificate of Public Convenience and Necessity before providing such services.
The appellants further argue that in prohibiting Interstate from entering the high-speed ferry market, the Division has impeded on the company's management prerogatives. The appellants contend that since Certificates of Public Convenience and Necessity specify only scope and termini of operations, the Division cannot enjoin Interstate from adding high-speed fetes to its fleet. The appellees respond that the Legislature could not have intended to give water caters like Interstate such unlimited powers and that it is within the Division's broad statutory powers to regulate the conduct of public utilities, including the type of vessels Interstate may use.
The Rhode Island Supreme Court has stated that "[t]his Court repeatedly has held that the broad regulatory powers of the PUC ordinarily do not include the authority to dictate managerial policy." Providence Water Supply Board v. Public Utilities Comm'n 708 A.2d 537, 543 (R.I. 1998) (Citations omitted.) The Court differentiates between regulating an industry in order to ensure that its rates are fair and reasonable as opposed to managing the utility or "exercis[ing] the prerogatives of ownership." Blackstone Valley Electric Co. v. Public Utilities Comm'n543 A.2d 253, 255 (R.I. 1988). In Providence Water Supply Board 708 A.2d at 540, the utility sought to install new water-meter-reading technology using funds allocated by the Commission for meter-reading modernization. The utility had not come before the Commission "requesting any [further] increase in rates." Id. The Court held that "the selection of meter-reading technology is an incident of management that as far as appears from the evidence would not have an adverse effect on any rights of ratepayers to be charged no more than just and reasonable rates." Id. at 543-544. (quoting Narragansett Electric Co. v. Kennelly 88 R.I. 56, 86, 143 A.2d 709, 722 (1958)).
The appellees correctly point out that the court cautioned that "even when a management function is at issue, the PUC does not exceed its authority by obstructing such a function to ensure that the rate-paying public is not unreasonably or unjustly affected." Id. at 544. In the instant case, however, the Division is prohibiting Interstate from entering the high-speed transportation market absent any evidence that it would result in harm to ratepayers. The Division states that "ultimately [it] must determine how best to protect the interests of present and future ratepayers" (Report and Order at 7.) However, the Division appears more concerned about Hi-Speed Ferry than the ratepayers when it held that Interstate could not be allowed to enter the high-speed market and compete directly with Hi-Speed Ferry. The Division indicated that it could not permit this to occur because "the high-speed ferry market is an undeveloped market that may or may not sustain the economic prosperity of the one cater that brought the service to light, IHSF." (Report and Order at 19.) Moreover, the Division noted that its goal was "to see this new market develop without the detrimental consequences posed by another cater, Interstate, competing head-to-head with IHSF during the infancy of the market high-speed, amenities-based ferry service." Id. Such explanations tend to indicate that the Division did not focus on whether Interstate's decision to enter the high-speed market would adversely affect the rights of ratepayers to be charged no more than just and reasonable rates.
 Notice
Another argument advanced by the appellants is that the Division's order and notice of hearing did not reasonably inform Interstate that the agency intended to investigate Interstate's future plans to enter the high speed ferry market. However, this argument can be disposed of quickly by referencing the notice issued by the Division on April 30, 1999, as well as the order and notice of hearing issued on June 11, 1999. In the initial notice, the Division stated that it was acting based on a petition filed by Hi-Speed Ferry requesting an investigation of Interstate pursuant to G.L. 1956 § 39-4-13. The Division enclosed a copy of the Petition which set forth the claim that Interstate had made certain inconsistent statements, as well as the relief being sought by Hi-Speed Ferry. The order and notice issued by the Division after receiving Interstate's response to the initial notice also references the Petition filed by Hi-Speed Ferry. These documents were sufficient to put Interstate on notice that the Division intended to ascertain its future plans regarding entry into the high-speed ferry market. Thus, appellants assertion that they were provided with insufficient notice as to the scope of the agency's investigation simply rings hollow.
 Confidential or Proprietary Information
The appellants also raise a variety of issues regarding the agency's determination that information about Interstate's future intentions to enter the high-speed market were not proprietary and confidential, including that the hearing officer's ruling requiring Interstate to disclose confidential information, exceeded its statutory authority, was made on unlawful procedure, was erroneous as a matter of law and was arbitrary and capricious. The Division imposed a civil penalty of $22,000 on Interstate for the refusal of its President, Susan Linda, to answer twenty-two (22) separate questions after having been ordered to do so by the Hearing Officer. G.L. 1956 § 39-2-8, provides:
 "[a]ny public utility which shall violate any provision of chapters 1-5 of this title, or shall do any act herein prohibited, or shall fail or refuse to perform any duty enjoined upon it for which a penalty has not been provided, shall be subject to a penalty of not less than two hundred dollars ($200) nor more than one thousand dollars ($1,000), and in the case of a continuing violation of any of the provisions of the chapters, every day's continuance thereof shall be and be deemed to be a separate and distinct offense."
Ms. Linda was initially asked "does Interstate Navigation presently intend to offer the public high speed ferry service from the Port of Galifee to Block Island at any time in the near future?" (Report and Order at 11.) She responded by refusing to answer the question and by asserting nine different privileges. Id. The twenty-one questions that were subsequently posed to Ms. Linda were mere variations on the "general question of whether the Company is prepared or intends to enter the high speed ferry market" (Report and Order at 15.)
At the outset, Ms. Linda noted that the information being sought was "proprietary and confidential to Interstate and protected from disclosure." Id. Interstate made a "motion that the hearings be closed to the public so that any information pertaining to Interstate's business strategy remained confidential." Id. at 4. The Division denied the motion, as well as Interstate's offer to reveal its plans in a closed hearing with assurances of confidentiality. The Division described Ms. Linda's actions as "a serious matter." However, Ms. Linda's refusal to answer any question regarding Interstate's possible future plans to enter the high speed ferry market should have come as no surprise given that Interstate raised the confidentiality issue in its motion to dismiss or, in the alternative, for summary disposition of Hi-Speed's petition to the Division. (Addendum at 69.) Moreover, in denying Interstate's motion for temporary restraining order and declaratory judgment, this Court took care:
 "[t]o suggest strongly to the Division and to the Attorney General's c office dealing with this matter that it, the Attorney General's office, has urged upon the Court the fact that the proprietary, confidential, information can be protected from being made public. And, the Court urges the department — the Division and you, sir — to make sure that it happens in this case." (Tr. at 41.) Interstate Navigation Company v. Division of Public Utilities and Caters, et al., C.A. No. 99-3055, June 22, 1999, Silverstein, J.
This suggestion was not heeded, and no accommodations were made to protect the information from being made public. Instead, the Division determined that "[a]s a public utility, Interstate should be treated no differently than its counterpart, IHSF. Furthermore, the simple issue of whether or not Interstate, as a regulated public utility intends to offer a particular service to the public is not at all something that warrants confidential treatment." (Report and Order at 5.)
There are a number of statutory provisions and agency rules that govern the issue of confidential information that comes before the Division. Rule 2 1 (e) provides that:
 "[u]pon motion by a party from whom discovery is sought and for good cause shown, the hearing officer may make an order when justice requires to protect the party from unreasonable annoyances, embarrassment, oppression, burden or expense or from disclosure of confidential business and financial information."
Rule 9 established different requirements regarding filings made with the Division and Rule 9 (h) provides that "[c]laims of confidential information shall be made pursuant to Rule 3 (d)." Rule 3 (d) states that "[alny claim of privilege shall be governed by the policy underlying the Access to Public Records Act, with the burden of proof resting on the party claiming the privilege." The Access to Public Records Act (APRA), G.L. 1956 §38-2-1 states, in pertinent part, that:
 "[t]he public's right to access to public record and the individual's right to dignity and privacy are both recognized to be principles of the utmost importance in a free society. The purpose of this chapter is to facilitate public access to public records. It is also the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy."
Finally, the relevant exception to the APRA is contained in G.L. 1956 § 38-2-2 (4)(i)(B), which provides that certain records shall not be deemed public, including:
 "[t]rade secrets and commercial or financial information obtained from a person, firm, or corporation which is of a privileged or confidential nature."
The Rhode Island Supreme Court recently interpreted the APRA language in Providence Journal Co. v. Convention Center Authority 774 A.2d 40, 47 (R.I. 2001) (quoting National Parks and Conservation Association v. Morton,498 F.2d 765 (D.C. Cir. 1974)) and adopted the definition of confidential as "any financial or commercial information whose disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." The Court also included in its definition "the protection afforded to commercial and financial information that the provider would not customarily release to the public." Id. In Providence Journal Co., 774 A.2d at 42, the plaintiff newspaper brought an action against the Convention Center Authority to obtain disclosure of documents concerning a golf tournament and convention center banquet. The Authority took the position that this information was not subject to disclosure pursuant to G.L. 1956 § 38-2-2 (4)(i)(B). Id. at 43. The trial justice conducted an in camera inspection of certain records and found that after review of the documents, "the Authority set forth a valid claim of privilege respecting confidential information." Id. at 44.
In the instant matter, the Division was not seeking to gain access to Interstate's documents, but rather sought to learn about the company's future plans to enter the high speed ferry transportation market. The Division based its finding that this information was not confidential on the manner in which it conducted the hearing on Hi-Speed's application for a Certificate of Public Convenience and Necessity. In Docket No. 98-MC-16, the "question of whether the applicant (IHSF) intended to provide a particular service to the public was a matter that was completely open for public inspection." (Report and Order at 4.) The only issue kept "under sealed record related to financial information of the applicant that, if disclosed, would provide any other potential competitor, including Interstate, with a strategic and financial road map for providing high speed catamaran service." Id. With regard to the questions posed to Ms. Linda, the Division stated that "none of the questions, if answered, would have presented information that could reasonably have been argued to constitute trade secrets or strategic financial information that should be protected from disclosure." (Report and Order at 15.) In Providence Journal the trial justice in noted that:
 "it was clear in reviewing these [documents] that in the hands of a competitor, probably someone else in this same business could look at these records and determine certain kinds of trends. That would disadvantage the Convention Center as far as its marketing position is concerned, and, therefore, the [c]ourt feels that the Convention Center did, in fact, claim a valid exemption under the Rhode Island Access to Public Records Act, and therefore the [c]ourt grants the motion for protective order."
These were the same concerns raised by Interstate in its motion to close the hearing to the public. Interstate's counsel explained "the only person that we do not want to reveal our proprietary and confidential information to is our potential competitor [IHSF]. If that potential competitor is aided by this division in inquiring into confidential information from us, then that puts our ratepayers at an unjust and illegal disadvantage." (Report and Order at 4.)
However, in Docket No. 98-MC-16, the Division had previously determined that Hi-Speed Ferry's plans to offer a particular kind of service did not constitute confidential information. While the Division determined that the general plans of the applicant to provide high-speed ferry service was not confidential, it did find that certain financial information of the applicant was confidential and should be kept under seal because it could provide a potential competitor "with a strategic and financial road map for providing high-speed catamaran service between Galifee and Block Island." (Report and Order at 4.) Thus, the Division found that the information regarding Interstate's plans to enter the high-speed ferry market was the kind of information the disclosure of which would not cause substantial harm to the competitive position of the person from whom the information was obtained. Consequently, the Division properly imposed a $1,000 fine for Ms. Linda's refusal to answer the question regarding Interstate's future plans to enter the high-speed ferry market. However, the Division exceeded its authority when it decided to multiply the fine by twenty-two, which represents the number of times the Division asked the same question in a different form. While the Division can fine Interstate for the refusal of its President to answer the questions submitted to her regarding the utility's future plans, the agency was limited by the language of G.L. 1956 § 39-2-8 which sets a maximum fine of $1,000 for each offense. Ms. Linda's refusal to answer twenty-one questions that were slightly different in form regarding Interstate's future plans constitutes only one offense for which Interstate can be fined the maximum $1,000 fine. The Division's imposition an additional $21,000 fine, for the twenty-one subsequent questions posed and not answered by Ms. Linda, exceeds its enumerated powers.
 Ms. Linda's Invocation of her Privilege Against Self-Incrimination
Of the nine different privileges invoked by Ms. Linda during her testimony before the Division, it was her reliance on her Fifth Amendment privilege against self-incrimination that most disturbed the agency. In its Report and Order, the Division described Ms. Linda's action as "nothing short of astounding." (Report and Order at 14.) Moreover, the agency felt that it was obliged to draw the conclusion that Ms. Linda's silence on the issue was an "affirmative response to the general question" of whether Interstate intended to enter the high-speed ferry transportation market. Division Rule 24 (b) and the statutory authority it invokes controls this matter. Rule 24 (b) provides that:
 "[p]ursuant to R.I.G.L. §§ 39-4-21 and 39-12-34, no person shall be excused from testifying and producing any materials in any investigation or hearing on the ground that such testimony or materials would tend to incriminate him or her."[2]
These provisions provide that Ms. Linda could not invoke her Fifth Amendment privilege against self incrimination during her testimony before the Division. As the Division noted, "[i]n this proceeding, there were no criminal allegations or charges pending against Ms. Linda or any Company official. Moreover, the Notice of the Hearing made no mention of any criminal allegation that might lead to possible referral to the Attorney General's Office for prosecution." (Report and Order at 15-16.) The Division proceeded to explain that "[t]here was not even a scintilla of criminality in the entire record." (Report and Order at 16.) The appellants note that he Fifth Amendment
 "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution, but also [accords him the] privilege not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." State v. Durchame 601 R.I. 937, 945 (R.I. 1991) (quoting Leflcowitz v. Turley 414 U.S. 70, 77, 94 S.Ct. 316, 322 (1973)).
However, Rule 24 (b) and G.L. 1956 §§ 39-4-21 and 39-12-34 provide that Ms. Linda's responses to the Division's inquiries could not be used against her in future criminal proceedings. The Division's determination that there was no basis for Ms. Linda's invocation of her privilege against self-incrimination was within the enumerated powers granted the agency and was not clearly erroneous.
 Conclusion
After a review of the entire record, the Court finds that the Report and Order of the Division prohibiting Interstate from entering the high-speed market for a three-year period commencing on May 1, 2000 and requiring Interstate, at the end of the three-year moratorium, to apply to the Division if it desires to provide such high-speed ferry service and to show that the public convenience and necessity would be served exceeds the statutory authority granted to the agency and prejudices substantial rights of Appellant Interstate Navigation Company. In addition, the Court finds that $21,000 of the $22,000 fine assessed on Interstate for the refusal of its President to answer questions posed to her by the Hearing Officer also exceeded the agency's statutory authority. The Court further finds that substantial rights of the appellants have been prejudiced. Accordingly, the Court reverses the Division's order.
Counsel for Interstate Navigation Company shall present an order consistent with the foregoing after notice to all other counsel of record.
[1] G.L. 1956 § 39-1-3 (a) provides in pertinent part that the public utilities commission "shall serve as a quasi-judicial tribunal." Rule 3 (a) of the Public Utilities and Carriers Division Rules of Practice and Procedure (Rule) states that "the Division of Public Utilities and Carriers is a governmental body charged with the supervision and execution of all laws relating to public utilities and carriers and all regulation and orders of the Commission governing the conduct of public utilities." The division of public utilities and carriers "functions to serve the commission in bringing to it all relevant evidence, facts, and arguments that will lead the commission in its quasi-judicial capacity to reach a just result." Providence Gas Co. v. Burke, 419 A.2d 263, 270 (R.I. 1988).
[2] G.L. 1956 § 39-4-21 states:
 "[n]o person shall be excused from testifying or from producing any books, accounts, papers, records, or documents in any investigation or inquiry by, or upon any hearing before, the division or member thereof when ordered to do so by the division or member, upon the ground that the testimony or evidence, accounts, papers, records, books, or documents, required of him or her may tend to incriminate him or her or subject him or her to penalty or forfeiture; but no person shall be prosecuted, punished or subjected to any penalty or forfeiture for or on account of any act transaction, matter, or thing concerning which he or she shall, under oath, by order of the division or a member thereof, have testified or produced the documentary evidence; provided that no person so testifying shall be exempt from prosecution or punishment for any perjury committed by him or her in his or her testimony. Nothing contained in this section is intended to give or shall be construed as in any manner giving any corporation immunity of any kind from the law."
In similar vein, G.L. 1956 § 39-12-34 provides:
 "[n]o person shall be excused from testifying or from producing any books, accounts, records, memoranda, correspondence, or other documents in any investigation or inquiry by or upon any hearing before the administrator, when ordered to do so by the administrator, upon the ground that the testimony or evidence, books, accounts, records, memoranda, correspondence, or other documents required of him or her may tend to incrimate him or her or subject him or her to penalties or forfeitures; but no person shall be prosecuted, punished or subjected to any penalty or forfeiture for or on account for any act, transaction, matter, or thing concerning which he or she shall, under oath, by order of the administrator, have testified or produced documentary evidence; provided, that no person so testifying shall be exempt from prosecution or punishment for any perjury committed by him or her in his or her testimony. Nothing in this section is intended to give or shall be construed as in any manner giving any corporation inmmunity of any kind from the law."