## PASCOAG FIRE DISTRICT

### v.

## PUBLIC UTILITIES COMMISSION OF RHODE ISLAND et al.

### No. 93-92-M.P.

Supreme Court of Rhode Island.

Jan. 21, 1994.

Dennis J. Duffy, Partridge, Snow & Hahn and Gary E. Blais, Blais & Associates, Providence, for plaintiff.

Gerald Caruso, Laurie Weisman, Boston, MA, Peter McGinn, Tillinghast, Collins & Graham, Providence, David Fazzone, Boston, MA, Ronald Gerwatowski, Narragansett

Elec. Co., Adrienne Southgate, Public Utilities Com'n, Providence, and Julio Mazzoli, Asst. Atty. Gen., for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on a statutory petition for certiorari pursuant to G.L. 1956 (1990 Reenactment) § 39-5-1 wherein Pascoag Fire District (Pascoag), a municipal electric utility corporation, seeks review of a report and order issued by the Public Utilities Commission (commission) holding that a Power Sales Agreement (PSA) entered into with the Massachusetts Municipal Wholesale Electric Company (MMWEC) was valid and enforceable and did not require the approval of the Division of Public Utilities and Carriers (division) under the terms of G.L. 1956 (1990 Reenactment) § 39-3-15. MMWEC was allowed to intervene in the proceedings before the commission. We deny the petition for certiorari and affirm the report and order of the commission. The facts of the case as found by the commission and the testimony upon which it relied, insofar as they are pertinent to this review, are as follows:

"Pascoag is a municipal electric utility servicing 3,923 customers. Prior to 1978 Pascoag purchased its power exclusively under long-term power contracts from the Blackstone Valley Electric Company. Legislation adopted in 1978 authorized Pascoag to issue bonds to purchase an ownership interest in generating facilities, or alternatively, to enter into PSA contracts with MMWEC. [1978 R.I.Acts & Resolves 59.] The legislation specifically states that Pascoag's obligations under any PSA contract 'shall not * * * be included in the debt of the district.' [Id., section 2.]

"MMWEC was created in 1975. There are currently 29 municipal electric departments which are MMWEC members. If MMWEC members express an interest in a particular facility, MMWEC creates a 'project' through which it acquires ownership. MMWEC finances its projects through the issuance of long-term revenue bonds, after approval is received from the Massachusetts Department of Public Utilities. These bonds are equally and ratably secured by all of MMWEC's project-related revenues; that is, financing is done on a system-wide rather than a project-by-project basis. The bondholders may not look uniquely to a given MMWEC member for payment if MMWEC defaults in its obligations.

"Once MMWEC has acquired an interest in a project, its members execute PSA contracts, making the member utilities 'participants' in the project. These contracts require a participant to make monthly payments covering its pro rata share of MMWEC's costs without regard to whether, when or how much power is actually received.

"In the fall of 1979, Pascoag and MMWEC executed a PSA, providing for the sale by MMWEC and purchase by Pascoag of a participant's 'share' of project capability in certain proposed nuclear generating units in Seabrook, New Hampshire. Mathieu E. Valliere, a long-time member of and, in 1979, Chairman of Pascoag's Operating Committee, testified in the [d]ivision proceedings that Pascoag sent a letter on October 23, 1979 to Edward F. Burke, then [c]ommission [c]hairman, regarding the impending PSA with MMWEC. That letter included a copy of the PSA for 'information and review' and noted that, 'if [Pascoag does not] hear from you within 10 days, I shall assume that the Public Utilities Commission approves the agreement.'

"The former legal counsel and general manager for Pascoag each testified during the [d]ivision hearings that Mr. Burke never responded to the October 23 letter. It is undisputed that no filing of the PSA was ever made with the [d]ivision."

The commission further found that

"Pascoag has never issued bonds, notes, or other long-term debt to pay for its PSA obligation. Payments on the PSA began in 1986. They have always been treated as operating expenses, passed through to ratepayers in [Pascoag's] purchased power adjustment clause filings."

Pascoag had asked the commission to declare its PSA with MMWEC to be invalid by

reason of its not having obtained division permission to enter into this agreement pursuant to § 39-3-15, which reads as follows:

"Security issues for which permission required.—A public utility, as defined in § 39-1-2, may not, without application to and authority from the division, issue stocks, bonds, notes, or other evidences of indebtedness, payable more than twelve (12) months from the date of issue, when necessary for the acquisition of property, the construction, completion, extension, or improvement of its facilities or for the improvement or maintenance of its service, or for the reorganization or readjustment of its indebtedness and/or capitalization, or for the discharge or lawful refunding of its obligations, or for the reimbursement of moneys actually expended from income or from any other moneys in the treasury of the public utility not secured or obtained from the issue of stocks, bonds, notes, or other evidences of indebtedness of the public utility."

In its report and order the commission by majority vote found as a fact and held as a matter of law that the PSA was not a security or an evidence of indebtedness, the execution of which requires the prior approval of the division.

Prior to convening a hearing on this petition for declaratory decision, the commission assigned an investigator to hear evidence and report his findings to the commission. The investigator conducted public hearings on May 14, 15, and 21, 1992. MMWEC was permitted to intervene as a party and participated fully in the hearings before the investigator. The Attorney General also participated as an intervenor. The investigator issued a report to the commission in which he concluded that the PSA constituted an evidence of indebtedness pursuant to § 39-3-15 so as to require prior approval of the division. Thereafter, on January 26, 1993, the commission considered the report of the investigator and heard arguments and comments from the parties on this same subject matter. On February 9, 1993, the commission (by majority vote) issued its report and order, which is now before this court for review.

Section 39-5-3 describes the standard of review to be applied by this court on the statutory petition for certiorari:

"Findings of commission.—The findings of the commission on questions of fact shall be held to be prima facie true, and as found by the commission and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the commission made in the exercise of administrative discretion shall not be reversed unless the commission exceeded its authority or acted illegally, arbitrarily, or unreasonably."

In arriving at its conclusion, the commission pointed out that the PSA did not raise capital for Pascoag, nor did the execution of the contract with MMWEC have any effect on Pascoag's capital structure. The commission pointed out forcefully that the PSA obligation has always been treated as an operating expense. The commission held that the obligation was never recorded as a liability by Pascoag and so to record it, the commission stated, "would have violated both generally accepted accounting principles and the accounting prescribed by the Federal Energy Regulatory Commission." The commission pointed out that historically both the commission and division have not treated PSA agreements as securities. Purchase-power contracts, like other routine operating contracts, simply do not fall within the regulatory scheme of § 39-3-15.

Thus the commission exercised its expertise in construing the statute in the light of generally accepted accounting principles and the regulatory procedures historically followed by both the commission and division. As we stated earlier, these are determinations of mixed questions of law and fact. We have stated in numerous cases that "[t]he commission's factual findings are taken as prima facie evidence of truth, over which the court cannot apply its own judgment or weigh conflicting evidence." *Providence Gas Co. v. Malachowski*, 600 A.2d 711, 714 (R.I. 1991); *South County Gas Co. v. Burke*, 551 A.2d 22, 24 (R.I.1988). The court does not act as a factfinder in commission matters. *See Block Island Power Co. v. Public Utilities Commission*, 505 A.2d 652, 653 (R.I.

1986); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 362–63, 358 A.2d 1, 7 (1976). We have accorded the same deference to review of a trial justice's finding on mixed questions of law and fact as we do on other aspects of factfinding. *Cerilli v. Newport Offshore, Ltd.,* 612 A.2d 35, 39 (R.I.1992); *Morgan v. City of Warwick,* 510 A.2d 1297, 1299 (R.I.1986). Certainly the same deference mandated by statute should be given to the findings of the commission on mixed questions of law and fact. The court cannot substitute its judgment on these issues relating to accounting principles as well as to statutory construction.

 In its brief, Pascoag urges us to adopt the requirement enunciated in *Environmental Scientific Corp. v. Durfee,* 621 A.2d 200 (R.I.1993), that the director of the Department of Environmental Management should not reject a hearing officer's recommendation on questions involving the credibility of contradictory witnesses. These principles are wholly inapplicable to the factfinding function of the commission. Indeed, we stated clearly in *Environmental Scientific Corp.,* that the Public Utilities Commission employs a single level of scrutiny. *Id.* at 207. We stated the "PUC administrative-hearing process in function is akin to a drainless basin into which liquids are poured. The PUC, as one level of policy review, is the repository into which flows all sources of information from which it forms its decision. The decision is final within the administrative structure." *Id.* Consequently the commission was not required to adopt the report of the investigator. That report was simply one of the factors to be considered in the commission's process of determination along with the submissions and arguments set forth by Pascoag and the intervenors as well as the amicus briefs provided by the Narragansett Electric Company, the Blackstone Valley Electric Company, and the Newport Electric Corporation.

Although the commission relied in part on the specific authorization given to Pascoag by a statute enacted in 1978 that authorized Pascoag to participate in electric-generating facilities and authorized Pascoag to issue revenue bonds in connection therewith, ultimately its determination was one of fact since Pascoag did not issue any bonds or securities. The question was, Did the PSA constitute evidence of indebtedness? The commission answered this question in the negative. Under our standard of review, we must accept that finding.

For the reasons stated, the petition for certiorari filed by Pascoag is denied. The writ heretofore issued is quashed. The report and order of the commission is affirmed. The papers in the case may be remanded to the commission with our decision endorsed thereon.

LEDERBERG, J., did not participate.