June 1, 2020

Supreme Court

No. 2017-415-M.P.
(Docket No. 4483)

ACP Land, LLC, et al.          :

v.          :

The Rhode Island Public Utilities          :
    Commission et al.

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

ACP Land, LLC, et al.            :

                v.               :

The Rhode Island Public Utilities    :
        Commission et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The petitioners, ACP Land, LLC (ACP) and Green Development, Inc. d/b/a Wind Energy Development, LLC (WED), filed a statutory petition for the issuance of a writ of certiorari with this Court seeking review of a November 27, 2017 order of the Public Utilities Commission (the PUC).  A writ of certiorari was thereafter issued.  The PUC order at issue, in relevant part, approved the interconnection tax which National Grid (NG) charged petitioners to interconnect to NG's distribution system and then paid to the Internal Revenue Service (IRS) as contributions in aid of construction.  The petitioners ask this Court to declare the PUC order "illegal and unreasonable" for purportedly failing to follow a specific IRS Ruling (IRS Notice 2016-36) and for failing to hold NG to its burden of proof.  They further argue that the PUC order nullified a settlement in the case.

     For the reasons set forth in this opinion, we affirm the order of the PUC.

- 1 -

# I

## Facts and Travel

This case calls upon us to decide the reasonableness of NG's position that it owes the IRS an interconnection tax when petitioners connect to NG's power distribution system rather than its transmission system; and whether, therefore, NG is reasonable in passing that tax on to petitioners. The facts and travel relating to this case are voluminous and somewhat technical in nature. Consequently, we will relate only those facts absolutely necessary to deciding this case. In so doing, we rely on the November 27, 2017 PUC order and various other documents contained in the record.

In summary, ACP owns and operates a solar energy system in Middletown, Rhode Island. WED owns and operates wind turbines and solar energy systems in Rhode Island. NG is a regulated electric and gas distribution company operating in Rhode Island. The petitioners interconnect with NG's distribution system in order to sell the power they produce. In order to interconnect, the petitioners must fund the improvements to the distribution system necessary for interconnections between their wind turbines and their solar systems and NG's distribution system (known as interties). After construction of the interties, NG assumes ownership and sole operation of the interties, and they become a permanent part of its distribution system. NG is of the view that it is subject to an IRS tax on the amount that it is reimbursed by the petitioners for the construction of the interties since those funds are taxable income to NG. Accordingly, NG passes that tax along to petitioners. The petitioners are of the opinion that they are actually exempt from the IRS interconnection tax and that, therefore, NG should not be charging them for it. The PUC held that NG was reasonable in charging petitioners the interconnection tax. It is that decision which we are now called upon to review.

Before relating the travel of this case, we think it prudent to detail the tax documents at issue that formed the basis of NG's and petitioners' arguments at the outset of this dispute. The issue is whether or not the cost of the interconnections which become part of NG's distribution system are part of NG's gross income and are therefore taxable. IRS Code § 118(a)—26 U.S.C. § 118(a)—provides that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." However, § 118(b)(1) states that "contribution to the capital of the taxpayer does not include * * * any contribution in aid of construction or any other contribution as a customer or potential customer * * *." (Internal quotation marks omitted.) Put more simply, a contribution in aid of construction (CIAC) is considered part of a corporation's gross income. NG maintains that the interties that become part of its distribution system when petitioners interconnect to that system are CIAC and, therefore, taxable.

IRS Notice 88-129 provides a safe harbor for transfers of interties from power generators (like petitioners) to utilities to permit connection to the utilities' *transmission system* for the purpose of selling electricity; that notice provides that such interties are not CIACs and thus are not taxable.[1] However, NG's distribution system (which is what petitioners in this case are connecting to) is distinct from its transmission system.[2] For that reason, NG concluded that

---

[1]    IRS Notice 88-129 explains that the dictates of 26 U.S.C. § 118(b) were intended to require utilities to include the value of a CIAC as income when the CIAC was made in order "to encourage the provision of services by a utility to a customer," rather than for the sale of energy by an energy-generating facility to the utility. However, the notice proceeds to refer specifically to interconnections with a utility's *transmission system* rather than its *distribution system*.

[2]    The United States Energy Information Administration explains the difference between a transmission system and a distribution system as follows:

> "Power plants generate electricity that is delivered to customers through transmission and distribution power lines. High-voltage transmission lines, such as those that hang between tall metal towers, carry electricity over long distances to meet customer

Notice 88-129 did not provide a safe harbor from the interconnection tax when, as is the case here, the power generator was connecting to the distribution system rather than to the transmission system. The petitioners disagreed.[3]

On January 15, 2014, petitioners filed a "petition for dispute resolution" with the PUC pursuant to Section 9.2 of the Narragansett Electric Company's Standards for Connecting Distributed Generation, RIPUC #2078 (the applicable tariff), seeking a determination as to whether or not NG was properly charging them an interconnection tax for connections to NG's distribution system. The petitioners sought a refund of previously paid interconnection taxes and a ruling by the PUC instructing NG not to charge them such a tax in the future. The petitioners contended that they had paid $23,000 in interconnection taxes to NG and that NG had quoted them a sum in excess of $270,000 in anticipated interconnection taxes for five projects that were then being planned. NG responded in a February 14, 2014 letter to the PUC, arguing as follows: (1) that the PUC did not have the jurisdiction to determine an issue of federal tax liability; (2) that the safe harbor provided for in IRS Notice 88-129 did not apply to interconnections to

---

needs. Higher voltage electricity is more efficient and less expensive for long-distance electricity transmission. Lower voltage electricity is safer for use in homes and businesses. Transformers at substations increase (step up) or reduce (step down) voltages to adjust to the different stages of the journey from the power plant on long-distance transmission lines to distribution lines that carry electricity to homes and businesses." U.S. Energy Information Administration, *Electricity Explained: How electricity is delivered to consumers*, https://www.eia.gov/energyexplained/electricity/delivery-to-consumers.php (last visited May 29, 2020).

[3]     The petitioners based their position on the just-discussed sources, as well as two IRS notices—IRS Notice 2001-82 and IRS Notice 90-60—and several private letter rulings—PLR 1122005, PLR 200134021, PLR 200403084, and PLR 200320019. The petitioners do not provide a detailed discussion of these documents in their written and oral submissions to this Court. For the purposes of this opinion, we likewise do not deem it necessary to discuss those documents in detail.

the *distribution system* (but only applied to interconnections to the *transmission system*); and (3) that NG was not free to rely on any of the IRS private letter rulings (PLRs[4]) to third parties (which letter rulings had been relied on by petitioners in formulating their argument) because PLRs cannot be relied upon by a party other than the taxpayer that obtained the ruling. NG further claimed that there was no "clear and consistent pattern" to be deduced from the PLRs on the subject. NG "offered to work with the Petitioners to file a private letter ruling with specific reference to the 'distribution interconnection' issue," but NG contended that the expense of doing so should be borne by petitioners, not by NG and its ratepayers.

The parties then met with senior legal counsel at the PUC, in an attempt to resolve the issue before moving forward with the process of outside mediation/non-binding arbitration as provided for in the tariff. On April 30, 2014, counsel issued a document entitled "Mediation/Non-Binding Arbitration Summary and Recommendations," in which she made recommendations to the PUC with respect to resolving the dispute. She framed the issue between the parties as "not whether [NG] owes the tax, but whether [NG]'s charge is reasonable and appropriate;"[5] she had previously stated in a memorandum to the parties that it was "outside

---

[4]     "A private letter ruling, or PLR, is a written statement issued to a taxpayer that interprets and applies tax laws to the taxpayer's represented set of facts[; it is] issued in response to a written request submitted by a taxpayer [and] may not be relied on as precedent by other taxpayers or by IRS personnel." Internal Revenue Service, *Tax Exempt Bonds Private Letter Rulings: Some Basic Concepts*, https://www.irs.gov/tax-exempt-bonds/teb-private-letter-ruling-some-basic-concepts (last visited May 29, 2020). NG, in a September 12, 2014 settlement proposal to the PUC, noted that PLRs typically cost $19,000, not including the administrative and legal costs associated with preparing the request. For that reason, according to NG, "when the tax liability is less than the cost of obtaining a PLR, it makes no sense for either the utility or the developer to pursue a PLR."

[5]     General Laws 1956 § 39-2-1(a) provides that any rate, toll, or charge collected by a public utility "shall be reasonable and just, and every unjust or unreasonable charge for the service is prohibited and declared unlawful * * *."

of [her] expertise and arguably, the jurisdiction of the [PUC,] to determine whether [NG] has tax liability."

Counsel then proceeded to note that the "burden of proof of the reasonableness of a rate, toll or charge is unequivocally on the utility." She ultimately concluded that NG was not assessing an unreasonable charge, but she added that, if NG did "not owe the tax, it should not be paying it and thus, should not be passing it through to the [petitioners]." With respect to the issue of obtaining a PLR to resolve the dispute and the issue of which party should pay for the request for a PLR, she stated that that was "an open policy question for the PUC to consider more fully as part of the further review allowed in the tariff." The petitioners maintained, at that time, that the burden of proof remained with NG and that the passed-through tax could not be reasonable until NG definitively established that the tax was in fact owed.

The parties thereafter agreed to waive a formal hearing and to file briefs on the issue before the PUC. On September 12, 2014, in response to the brief of petitioners, NG filed a settlement proposal entitled "[NG's] Proposal to Resolve the Issues in this Docket," in which it proposed "to apply for one to four PLRs [from the IRS] associated with projects that interconnect with [NG]'s electric distribution system and otherwise meet the remaining criteria required by the IRS" so as to fall within the safe harbor as articulated in IRS Notice 88-129.[6] NG stated that, if the PLRs "provide[d] a reasonable basis to conclude that the tax exemption applies to projects interconnected to electric distribution facilities, [NG would] recommend that it no longer pay taxes on future projects meeting the IRS criteria and, thus, no longer collect the tax from the eligible projects." On the other hand, if the PLRs did not "provide the necessary

---

[6]     NG noted, in its proposal, that the interconnection tax issue was likely to arise in connection with a number of upcoming projects and that, therefore, NG deemed it advisable at that time to obtain a PLR relative to the issue.

clarity, [NG would] recommend that taxes continue to be paid and the cost collected from each project developer that interconnects a project to [NG's] electric distribution system."

NG also offered to begin requiring "all future project developers * * * [to] place an amount in escrow with [NG] equal to the potential tax liability, to be refunded if a decision is later made by the PUC that the taxes should not be paid." NG requested approval from the PUC to "defer the costs of seeking each PLR and recover such costs in rates in a future reconciliation to be determined." On December 23, 2014, the PUC approved NG's settlement proposal (including the deferral of the costs of the PLRs) with some small modifications—specifically, the PUC required that NG seek the first private letter request "as soon as possible" and that such request "relate to one of [the] Petitioners' projects." The PUC further required that "[i]n the event of an IRS ruling declaring distribution interconnections nontaxable, [NG] will seek a refund from the IRS to reimburse Petitioners before seeking deferral and recovery from ratepayers."

NG's PLR request was filed with the IRS on August 13, 2015. NG shared the content of the PLR request with the PUC in advance, and it was approved by the PUC. It requested the following ruling:

> "The transfer of the Interconnection Payment by [petitioners] to [NG] will not constitute a contribution in aid of construction under section 118(b) and will be excludible from the gross income of [NG] as a non-shareholder contribution to capital under section 118(a), notwithstanding that the interconnection is between the [petitioners] and [NG's] electric distribution system and not with an electric transmission system."

The request argued that there was "no rational basis" for a distinction between the transmission and distribution systems "[f]or [the] purposes of determining the tax treatment to a utility of a contribution of interconnection equipment * * *."

On November 9, 2015, rather than issuing a substantive response, the IRS notified NG that the Department of the Treasury intended to issue published guidelines on the issue; thus, the IRS closed the file on NG's request for a PLR. Subsequently, on June 10, 2016, IRS Notice 2016-36 (the 2016 Notice) was published. NG and the petitioner disagree as to whether or not the 2016 Notice resolved the interconnection tax issue. The petitioners filed a letter with the PUC on July 7, 2016, arguing that the 2016 Notice made "it even clearer that generator interconnections to the distribution system are safe harbored and exempt from the interconnection taxes [NG] has assessed." NG contended in an August 26, 2016 letter to the PUC that the 2016 Notice was ambiguous as to whether or not the tax is owed with respect to connecting to a distribution system. We will discuss the language of the 2016 Notice in more detail below.

In an attempt to resolve what NG considered to be continued uncertainty concerning the interconnection tax issue, Robert Ermanski, NG's Director of U.S. Tax Research and Planning, telephoned the IRS contact person identified in the 2016 Notice—*viz.*, IRS counsel David Selig, who had drafted the 2016 Notice. Following that conversation, on June 28, 2016, Mr. Ermanski sent an email to Mr. Selig requesting written clarification. In the email, NG noted that Mr. Selig had verbally confirmed that the 2016 Notice was intended to cover interconnections to the distribution system, but that Mr. Selig had acknowledged "that the IRS may need to issue additional guidance to make this clearer." Despite this statement, the IRS has not issued any further guidance about the issue.

NG then engaged its tax consultant, Ernst & Young LLP, to provide a written opinion on the issue. On September 30, 2016, Ernst & Young issued a written opinion strictly construing the 2016 Notice and concluding that interconnections to the distribution system did not meet the

requirement of the 2016 Notice so as to be exempt from being taxed. Subsequently, in an October 13, 2016 letter to the PUC, NG informed the PUC of its intention to continue to treat interconnections of the type at issue as taxable transactions. The petitioners, for their part, objected to the conclusions in the Ernst & Young opinion in an October 21, 2016 letter to the PUC.

On May 25, 2017, the PUC held an open meeting to determine whether or not it was reasonable of NG to continue to pass along its interconnection tax charges to petitioners in the circumstance at issue. The PUC determined, by a 2-1 vote, that NG's decision to continue collecting the tax was reasonable. The PUC filed its order on November 27, 2017, in which it noted that the two commissioners in the majority relied on the Ernst & Young opinion in determining that NG's actions were reasonable. The dissenting commissioner contended that the 2016 Notice extended the safe harbor to interconnections to a distribution system.

On December 4, 2017, petitioners filed for a statutory writ of certiorari, which was then issued by this Court on December 18, 2017.

## II

### Issue Raised Before This Court

The question presented to us is whether or not the PUC erred in determining that NG is reasonable in believing that it owes a tax to the IRS on the interties between the petitioners' solar and wind systems and NG's distribution system—and in, consequently, passing that tax on to petitioners. For the sake of clarity, we wish to emphasize that we are not presented with a question as to whether or not NG owes the interconnection tax to the IRS, but only whether NG is reasonable in believing that it owes the tax. Whether the tax is actually owed to the IRS is a question of federal tax law and is not before this Court at this time.

# III

## Standard of Review

We have stated that "[i]t is undisputed that this Court affords great deference to the PUC's decisions." *Portsmouth Water and Fire District v. Rhode Island Public Utilities Commission*, 150 A.3d 596, 602 (R.I. 2016). Indeed, the General Assembly has provided for a quite limited standard of review as follows:

> "The findings of the [PUC] on questions of fact shall be held to be prima facie true, and as found by the [PUC] and the supreme court, shall not exercise its independent judgment nor weigh conflicting evidence. An order or judgment of the [PUC] made in the exercise of administrative discretion shall not be reversed unless the [PUC] exceeded its authority or acted illegally, arbitrarily, or unreasonably." G.L. 1956 § 39-5-3.

In reviewing a PUC decision, we are tasked with determining "whether the decision of the [PUC] was fairly and substantially supported by legal evidence specific enough to enable us to ascertain if the facts upon which the [PUC's] decision is premised afford a reasonable basis for the result reached." *Portsmouth Water and Fire District*, 150 A.3d at 602 (internal quotation marks omitted); *see also In re Kent County Water Authority Change Rate Schedules*, 996 A.2d 123, 128 (R.I. 2010). "[O]ur review requires us to determine whether the PUC ruled in a lawful and reasonable manner and whether its findings of fact are fairly and substantially supported by legal evidence." *Portsmouth Water and Fire District*, 150 A.3d at 602 (internal quotation marks omitted); *see also In re Providence Water Supply Board's Application to Change Rate Schedules*, 989 A.2d 110, 114 (R.I. 2010). A party which seeks to overturn a finding of the PUC faces a "difficult burden to overcome." *In re Providence Water Supply Board's Application to Change Rate Schedules*, 989 A.2d at 115; *see also In re Kent County Water Authority Change Rate Schedules*, 996 A.2d at 128. We have also stated that the "same deference mandated by

statute should be given to the findings of the [PUC] on mixed questions of law and fact." *Pascoag Fire District v. Public Utilities Commission of Rhode Island*, 636 A.2d 689, 692 (R.I. 1994).

However, "pure questions of law, including statutory interpretations, decided by the [PUC] are reviewed *de novo* by this Court." *In re Proposed Town of New Shoreham Project*, 25 A.3d 482, 504 (R.I. 2011); *see also Portsmouth Water and Fire District*, 150 A.3d at 602.

**IV**

**Analysis**

**A**

**Interconnection Tax**

Before this Court, petitioners contend that the PUC's order is "illegal and unreasonable" for failing to adhere to what they deemed to be the import of the 2016 Notice. They allege that "[t]he plain text of [the 2016 Notice] is not open to interpretation," and they point specifically to the following sentence contained in that document: "[A] generator (such as a solar or wind farm) may contribute an intertie to a utility that qualifies under the new safe harbor even if the generator is interconnected with a distribution system." The petitioners further point to the fact that the 2016 Notice was intended by the IRS to resolve the issue.

On the other hand, NG contends that the PUC did in fact act reasonably in reaching its ultimate conclusion. It asserts that NG's decision to rely on the "advice of its tax advisers is both reasonable and prudent." The PUC contends before this Court that the PUC and NG made "good faith efforts in an attempt to find the correct answer to an evolving, complex IRS tax code issue," but that, given the continued uncertainty, "while balancing the interests, obligations, and

liabilities of the parties, the [PUC] made the reasonable decision to affirm the pass-through tax charge."[7]

In order to address the contentions that have been made before this Court, we must turn to the document at the heart of the dispute on appeal—the 2016 Notice. We begin by noting that the petitioners accurately quote the 2016 Notice as saying that "a generator (such as a solar or wind farm) may contribute an intertie to a utility that qualifies under the new safe harbor even if the generator is interconnected with a *distribution system* * * *." (Emphasis added.) The petitioners rely on that sentence to show that the 2016 Notice provides, beyond any doubt, that the safe harbor from the interconnection tax is applicable to the interties connecting their power generating facilities to NG's distribution system.

On the other hand, NG maintains that the 2016 Notice, when read as a whole, does not provide clarity as to the issue. NG employed Ernst & Young to analyze the 2016 Notice; the resultant September 30, 2016 opinion produced by Ernst & Young reaches the conclusion that the 2016 Notice is not clear. We will review the pertinent aspects of that opinion in order to set forth our understanding of NG's argument as to the lack of clarity in the 2016 Notice.

The Ernst & Young opinion stated that NG "requested the opinion * * * of Ernst & Young LLP * * * regarding the application of Notice 2016-36 and its 'safe harbor' to the interconnection of an electricity generation or cogeneration facility * * * with an electric distribution system that [NG] owns and operates * * *." The opinion noted that the IRS Code is subject to strict construction, as are provisions that provide exemptions from taxation. The

---

[7]    We note initially, with respect to the applicable standard of review, that we need not address whether we are confronted with a question of law, a question of fact, or a mixed question of law and fact because our conclusion in this case would be the same whether we apply a deferential standard of review or a *de novo* standard.

opinion then proceeded to state that the 2016 Notice, as a whole, actually "focuses on transfers of property to a regulated public utility for use in the utility's transmission system." Ernst & Young looked specifically to various portions of the 2016 Notice to support that statement.

Specifically, Ernst & Young looked to the purpose of the 2016 Notice, as set forth in Section I of that notice, which stated as follows:

> "This notice provides a safe harbor for transfers of property from either an electricity generation or cogeneration facility or an energy storage facility to a regulated public utility, used to facilitate the transmission of electricity over the utility's *transmission system* * * *." (Emphasis added.)

Further, the Ernst & Young opinion referenced Section III.C of the 2016 Notice, which provides that the safe harbor applies only to the contribution of an intertie. "[I]ntertie" is defined in Section III.B as including the following:

> "new connecting and transmission facilities, or modifications, upgrades, or relocations of a utility's existing *transmission network* that enable or facilitate the interconnection of a generator with a utility or improve efficiency on the utility's *transmission network*." (Emphasis added.)

Finally, the Ernst & Young opinion pointed out that Section III.C of the 2016 Notice set forth the specific requirements for applicability of the safe harbor and included the following reference to only the transmission system: "[i]n the case of electricity wheeled over the utility's *transmission system*, ownership of the wheeled electricity remains with the generator prior to its transmission onto the grid." (Emphasis added.) There is an additional requirement in Section III.C of the 2016 Notice that required that "[t]he intertie will be used for transmitting electricity."

The Ernst & Young opinion went on to discuss the specific sentence relied upon by petitioners, which appears in the "Explanation of Provisions" section (Section III.A) of the 2016 Notice. However, the opinion pointed out that, despite that sentence in the "Explanation of

- 13 -

Provisions" section, the "Purpose" and "Requirements" of the 2016 Notice, as provided for in Sections I and III.C respectively, made no mention of distribution systems.  The Ernst & Young opinion then proceeded to state the following:

> "[S]trict construction of Notice 2016-36 dictates that the use of the safe harbor set forth in such notice is limited to transfers of property to a regulated public utility that are then used by such utility to facilitate the transmission of electricity over the utility's transmission system."

The Ernst & Young opinion ultimately concluded as follows: "Payments made by the Facility to [NG] to construct an intertie connecting the Facility to the Company's distribution system do not meet the requirements of the safe harbor set forth in Section III. C of Notice 2016-36."[8]

In addition to the Ernst & Young opinion, NG also reached out to IRS Counsel David Selig, who appears to have acknowledged in the course of a telephone conversation "that the IRS may need to issue additional guidance to make this clearer."

In assessing the reasonableness of NG's decision to continue to charge the interconnection tax to petitioners, we also deem it worth noting the existence of a pertinent private letter ruling issued prior to the release of the 2016 Notice.[9]  PLR 145294-14 (the MA PLR) was provided to Massachusetts Electric Company, NG's Massachusetts affiliate, on February 3, 2016.  In that PLR, the IRS concluded that, under the circumstances of that case (which were similar to those presented in this case), "the transfer of the Intertie is not subject to

---

[8]    It is worth noting that, in an August 26, 2016 letter which NG sent to the PUC, NG stated that it had previously "filed two private letter ruling requests [with the IRS] to determine whether the IRS' use of the term 'transmission' was sufficiently elastic to also include 'distribution.'"  The letter went on to state that the "yery [*sic*] clear answer received in PLR 201619007 was that 'transmission' only means 'transmission.'"  (Emphasis omitted.)

[9]    We recognize that this PLR is only applicable to the taxpayer—Massachusetts Electric Company.  However, it is relevant in assessing the reasonableness of NG's interpretation of the state of the law with respect to the issue before us.

the guidance set forth in Notice 88-129, Notice 90-60, and Notice 2001-82 because there is no direct interconnection between the Facility and an electric *transmission system* * * *." (Emphasis added.) Consequently, the IRS stated that "the transfer of the Intertie by Generator to Taxpayer is a CIAC under § 118(b) and is not excludable from the gross income of Taxpayer as a nonshareholder contribution to capital under § 118(a)." In that PLR, which was issued less than six months before the 2016 Notice, the IRS reached the opposite conclusion to that which petitioners contend is clearly provided for in the 2016 Notice.

Taking into account the language of the 2016 Notice, the Ernst & Young opinion, the MA PLR, and other documents in the record, we are left with the ineluctable conclusion that, due to the uncertainty in the law, it was eminently reasonable of NG to come to the decision that it must continue to pay the interconnection tax. Consequently, we are unable to perceive any error on the part of the PUC in determining that NG's conclusion was reasonable.

We readily acknowledge that the sentence from the 2016 Notice relied upon by petitioners, when read apart from the overall context, would seem to indicate that the interconnection tax was not due; however, we must look to the 2016 Notice as a whole. *See Grasso v. Raimondo*, 177 A.3d 482, 490 (R.I. 2018) (stating that it was "inappropriate" to look at a certain statutory section "in a vacuum; we must consider it in light of the entire statutory scheme"); *see also* 2A Norman J. Singer and Shambie Singer, *Sutherland Statutes and Statutory Construction* § 46:5 at 204 (7th ed. 2007) (stating that "each part or section [of a statute] should be construed in connection with every other part or section to produce a harmonious whole"). The Ernst & Young opinion makes it very clear that, when one looks at the 2016 Notice as a whole, it remains uncertain whether the safe harbor from the interconnection tax applies to an

intertie connecting to a distribution system or applies only to an intertie connecting to a transmission system.

We also believe it necessary to point out that, if NG were to cease charging petitioners and other similarly situated companies an interconnection tax when it remains reasonable for NG to believe that that tax is in fact owed, the risk that NG does actually owe the tax would fall on all of the ratepayers in this state; if an ultimate determination were made by the IRS that the interconnection tax was owed and NG had ceased charging petitioners that tax, NG would have to pass that tax on to ratepayers in order to meet its obligation to the IRS. It seems to this Court that the risk should remain with the companies who are requesting the interties at issue and then reimbursing NG for the cost of construction of those interties.[10]

In reviewing this record, it became abundantly clear to this Court that NG has fully cooperated in this dispute resolution petition and has made every effort to resolve it in a manner that is satisfactory to all of the parties. Unfortunately, even after the guidance provided by the IRS in the form of the 2016 Notice, it remains entirely within the zone of reasonableness for NG to believe that it continues to owe the interconnection tax to the IRS.

---

[10]     We note that petitioners also aver before this Court that the PUC's order "illegally and unreasonably failed to hold [NG] to its burden of proof that its charge was necessary and reasonable." Specifically, they claim that NG "does not meet its burden to impose this charge under Rhode Island law in the absence of certainty that the charge is owed." In asserting that NG had not met its burden, petitioners rely on G.L. 1956 § 39-3-12 to show that NG had such a burden. However, § 39-3-12 applies specifically to proposed increases in the rate, toll, or charge, stating that "the burden of proof to show that the increase is necessary in order to obtain a reasonable compensation for the service rendered shall be upon the public utility * * *." Notably, however, this case does not involve an increase in the rate at issue; therefore, § 39-3-12 is not applicable to this situation. We would nevertheless note that, in our opinion, any uncertainty in this case resulted from extraneous factors, not from any failure on the part of NG to meet a burden of providing sufficient evidence to prevail before the PUC and this Court. What is more, it would be illogical to require NG to definitively establish that the interconnection tax is or is not owed when NG's ability to do so would be contingent on the uncertain future actions of the IRS.

We wish to express in closing our fervent hope that the IRS will provide clear and concise guidance to these parties in the near future. At this moment, however, we are constrained by the state of the law as it presently stands. And as it stands, in our judgment, NG is entirely reasonable in believing that it continues to owe the interconnection tax at issue in this case to the IRS and in, therefore, passing that tax on to petitioners. Accordingly, we are unable to perceive any error on the part of the PUC in this case.

## B

### The Settlement Proposal

The petitioners contend that the PUC Order "unlawfully and unreasonably nullified the settlement between the parties where [NG] agreed to refund the tax once the IRS resolved any alleged ambiguity on the safe harbor." They argue that, "[e]ven if this Court were to hold that the IRS Notice is unclear on the application of the safe harbor to [petitioners'] projects, in the absence of justification for this charge, [NG] must honor its settlement and hold the [t]axes for refund once the IRS clarifies Notice 2016-36." Further, they request that this Court order NG to refund all interconnection taxes paid after December 23, 2014.

NG contends that, in its settlement proposal, it agreed to hold the tax funds in escrow until a decision was made by the PUC—not by the IRS. Therefore, it contends that it "need not continue to escrow the [t]axes or refund them to [p]etitioners if and when the PUC found that [NG] acted reasonably in assessing the [t]ax." The PUC avers that the Order "reasonably and rationally" did not provide for a refund of the collected taxes to petitioners.

After consideration of the language in NG's settlement proposal and the contentions of the parties, we are in agreement with the averments made by NG and the PUC. In reaching our conclusion, we needed to look no further than the language of NG's settlement proposal. That

proposal states that NG would require "all future project developers * * * [to] place an amount in escrow with [NG] equal to the potential tax liability, *to be refunded if a decision is later made by the PUC that the taxes should not be paid*." (Emphasis added.) That clear and unambiguous language offered a refund if the PUC were to make a decision that the taxes at issue should not have been paid. The PUC in fact came to the opposite conclusion, stating that NG was reasonable in continuing to charge petitioners the interconnection tax. Thus, the explicit language of the settlement proposal does not support petitioners' argument that a refund is warranted. *See Sophie F. Bronowiski Mulligan Irrevocable Trust v. Bridges*, 44 A.3d 116, 121 (R.I. 2012) ("It is a fundamental principle of contract law, and the settled law of this state, that clear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions.") (internal quotation marks omitted). What is more, contrary to the contention of the petitioners, the language of NG's settlement proposal very definitely does not state that the funds would be held in escrow *until the IRS clarifies the state of the law*. It would be nonsensical, after the PUC has made its decision, to require NG to continue to hold the interconnection tax funds in escrow pending clarification from the IRS, which could be a long time coming.

Accordingly, in our judgment, the PUC order fully comports with the settlement proposal—NG is not required to continue to escrow the interconnection tax funds being paid to it by the petitioners, nor is it required to refund what it currently holds in escrow.

## V

## Conclusion

For the reasons set forth herein, we affirm the order of the PUC. The record may be remanded to the PUC.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | ACP Land, LLC, et al. v. The Rhode Island Public Utilities Commission et al. |
| **Case Number** | No. 2017-415-M.P. (Docket No. 4483) |
| **Date Opinion Filed** | June 1, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | The Rhode Island Public Utilities Commission |
| **Judicial Officer From Lower Court** | N/A |
| **Attorney(s) on Appeal** | For Petitioners:<br><br>Seth H. Handy, Esq.<br><br>For Respondents:<br><br>Christy Hetherington, Esq.<br>Adam M. Ramos, Esq.<br>Tiffany A. Parenteau, Esq.<br>Gerald J. Petros, Esq.<br>Christine E. Dieter, Esq. |